[No. A076713. First Dist., Div. Four. June 10, 1998.]

STEPHEN M. MOREY et al., Plaintiffs, Cross-defendants and Appellants, v. NEILO VANNUCCI et al., Defendants and Respondents; BAY CITIES BUILDING MATERIALS CO., INC., Defendant, Cross-complainant and Respondent.

## COUNSEL

Edward D. Hume for Plaintiffs, Cross-defendants and Appellants.

Dek Ketchum and Jenny D. Smith for Defendants and Respondents and for Defendant, Cross-complainant and Respondent.

**OPINION**

**McGUINESS, J.**—Stephen M. Morey (Morey) and the Morey Group[1] appeal from a judgment entered on a jury verdict in favor of respondents Bay Cities Building Materials Co., Inc., (Bay Cities), Neilo Vannucci, Neil Vannucci, Nino Campagna, and William Monlux, on both appellants' complaint for breach of a trucking contract (the contract) and respondent Bay Cities' cross-complaint for declaratory relief as to the meaning of a key term used in the contract.[2] Appellants contend the trial court erred in submitting to the jury the interpretation of the subject term as used in the contract and in refusing to give appellants' requested jury instructions defining the term as a matter of law. We conclude the trial court was correct in submitting the interpretation of the contractual term to the jury as a disputed issue of fact on conflicting evidence extrinsic to the contract. We therefore affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1963, appellant Morey's grandfather founded Peninsula Building Materials. During the mid-1970's, Morey worked for CAP Concrete (CAP), a subsidiary of Peninsula Building Materials that dealt in the ready-mix concrete business. Morey became owner and president of CAP in 1977, after the death of his father.

In 1981, Morey purchased Universal Transport, a cement trucking company. CAP began losing money, and by 1983 was in serious financial difficulty and facing possible bankruptcy. Morey consequently decided to sell CAP's South San Francisco ready-mix concrete plant to Bay Cities for between $1.4 and $1.5 million. On April 15, 1983, as part of the consideration for this sale, Bay Cities entered into 99-year trucking and "batch-out" agreements with Morey giving him and any entities controlled by his family certain privileges. Although both CAP and Bay Cities were represented by counsel, the actual agreements were negotiated by the parties themselves in a series of meetings without the assistance of their attorneys.

---

[1]As alleged in the second amended complaint, "the Morey Group . . . consists of those organizations as from time to time are controlled by [appellant Stephen M.] Morey as the trustee of the Stephen M. Morey Trust. As of the date of the filing of [the second amended] complaint, the MOREY GROUP consists of Sugar Mountain Pump Co., Ltd., a California corporation, doing business as Sugar Mountain Transport Co. ['Sugar Mountain']." The record shows that Sugar Mountain went bankrupt in 1991, was liquidated in 1992, and has not conducted business since at least January 1993. However, because appellants are consistently referred to in the plural throughout the record of this case and in the parties' briefs on appeal, we will also refer to appellants in the plural in this opinion.

[2]Respondent Bay Cities is engaged in the manufacture of ready-mix concrete. The individual respondents are the principal officers and directors of Bay Cities.

The trucking agreement contained a provision entitled "Option to Transport" (the option provision), giving CAP and Morey the opportunity to provide Bay Cities with certain "transportation activities." Specifically, the option provision stated that Bay Cities "hereby grants" CAP and the Morey Group "the option" to supply transportation services for hauling cement and aggregate to Bay Cities' facilities in Colma, South San Francisco, Millbrae and its Rio Linda and Lincoln plants near Sacramento, "if and whenever Bay Cities is unable to provide such transportation activities with vehicles owned and operated by Bay Cities or its affiliated entities." The "batch-out" agreement provided that CAP and the Morey Group would have "the right and option to purchase from Bay Cities any quantity up to an aggregate amount of 200,000 cubic yards per year of concrete" at a price computed by the actual costs of manufacturing the ready-mix concrete by Bay Cities with an additional "overhead fee" of $2 per cubic yard.

Bay Cities used a three-tier system to provide for the trucking of the raw materials used in its ready-mix concrete business. The first tier consisted of tractors and trailers owned and operated by Bay Cities' own subsidiary trucking company. These tractors (also known as "power units") were driven by union employees of Bay Cities and pulled the various sorts of specialized trailers used to transport sand, gravel, aggregate and bulk cement.

The second tier consisted of trailers owned by Bay Cities for which it did not have available tractor power units. In this second tier of trucking, Bay Cities' trailers were pulled by nonunion, independent owner-operator subhaulers driving their own tractors. Bay Cities called on these independent owner-operators regularly, and heavily relied on them to supply their transportation needs. Consequently, Bay Cities had close, long-term business relationships with these independent subhaulers, most of whom had worked exclusively and loyally for Bay Cities for many years.

Finally, the third tier of transportation consisted of outside truckers to whom Bay Cities would turn when it needed more trucking transportation than it could provide itself, either through its own union employees or by use of its own trailers pulled by the independent subhaulers. These outside truckers generally provided both power units and trailers appropriate for hauling the particular type of material Bay Cities needed to have transported. Appellant's own company, CAP, was organized in the same three-tiered fashion as Bay Cities.

Between 1983 and 1989, Morey never complained to Bay Cities that it was not providing him with the trucking business to which he was entitled under the option provision of the trucking agreement. It is undisputed that

during this time period, Bay Cities regularly called upon appellants' trucking services whenever Bay Cities needed additional trucking and could not meet its transportation needs through its own trucks or those of the independent nonunion subhaulers. In that same time period, Morey's trucking business had continuing financial difficulties which resulted in CAP twice going into chapter 11 bankruptcy proceedings. Between 1987 and 1988 CAP and its two trucking subsidiaries, CAP Transport and Morey Transport, were liquidated. Thereafter, neither CAP Transport nor Morey Transport owned any tractor or trailer units capable of hauling cement or the other material necessary to manufacture ready-mix cement. The only remaining entity owned by Morey with such equipment was Sugar Mountain, which owned only tractors but no trailers.

In March of 1989, Morey began complaining that he was not getting enough trucking business from Bay Cities. For the first time, he took the position that Bay Cities should terminate its business relationships with the independent subhaulers in order to give Morey the exclusive right to all trucking other than that done by Bay Cities' own union employees driving Bay Cities' own tractor-trailers. Because Morey no longer owned any trailers, this dispute necessarily focused on whether Bay Cities was obligated to call Sugar Mountain for tractors to haul Bay Cities' trailers before relying on Bay Cities' long-term relationship with the independent nonunion subhaulers. After an exchange of letters from the parties' attorneys, Bay Cities offered to arbitrate the disagreement. The matter was thereafter dropped. During the remainder of 1989 and until late 1991, Morey continued to do excess hauling for Bay Cities' facilities in Millbrae and South San Francisco. In addition, Bay Cities permitted Morey to perform excess hauling for its Redwood City facility. These Redwood City hauls were not covered by the 1983 option provision, which only applied to facilities in Colma, South San Francisco, Millbrae, and the Sacramento area.[3]

In September 1991, Morey again began complaining about not receiving all the trucking he claimed was due to him. He approached respondent Monlux with a proposal that he take over all the trucking at the Millbrae and South San Francisco plants by placing Bay Cities' independent subhaulers under Morey's supervision. Under Morey's proposal, instead of the 15 percent trailer rent they paid Bay Cities for hauling Bay Cities-owned trailers, the independent subhaulers would pay Morey 25 percent, consisting of a 15 percent trailer rental for Bay Cities plus an additional 10 percent

---

[3]Before filing this lawsuit, Morey never expressed any interest in trucking in the Sacramento area. On at least two occasions in 1983 and between 1986 and 1988, Morey actually declined to provide transportation services around Sacramento, claiming it was too far and too difficult to manage adequate supervision of trucks and drivers.

brokerage fee for Morey. According to Morey, the arrangement would be in the independent subhaulers' economic interest because he would find them additional outside work to perform when they needed it.

With the acquiescence of Bay Cities, Morey made a presentation to the subhaulers in which he tried to persuade them to agree to his proposal. Without exception, all the independent subhaulers rejected Morey's proposal as not in their best financial interest. Morey subsequently confronted Monlux and accused Bay Cities of disrupting or sabotaging his proposal by telling the independent subhaulers not to do business with him. Monlux denied it, and suspended Morey from the privilege of servicing the Redwood City plant.

When Bay Cities refused to terminate its business relationships with the independent subhaulers, Morey filed this lawsuit in December 1991. After respondents' demurrer was sustained with leave to amend, Morey filed a second amended complaint adding four additional causes of action against respondents. The second amended complaint sought damages in excess of $263,961,000 for alleged breaches of the trucking and batch-out agreements, with treble damages on the basis of a claim under the federal Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.), and an additional $91 million in damages for alleged anticipatory repudiation of the batch-out agreement. Bay Cities filed a cross-complaint for declaratory relief asking the court to determine the meaning of the contractual term "affiliated entities" as used in the option provision.

At the outset of trial, appellants amended their complaint to replace their original request of $91 million for breach of the batch-out agreement with a request for nominal damages and declaratory relief on the basis of a single alleged refusal to permit Morey to purchase concrete in September 1995. The parties stipulated to a bifurcated court trial on appellants' claims for nominal damages and declaratory relief arising from alleged breach of the batch-out agreement. On the first day of jury trial, the trial court granted appellants' motion to dismiss without prejudice their fourth cause of action for rescission of the underlying sale of the CAP ready-mix concrete plant to Bay Cities. At the close of appellants' presentation of evidence at trial, respondents moved for nonsuit on the first cause of action under RICO. The trial court granted the motion without opposition from appellants. The jury subsequently returned verdicts in favor of respondents on all remaining causes of action for breach of the trucking agreement, and made special findings on four questions concerning the intended meaning of language in the trucking agreement and Morey's performance thereof.

Specifically, the jury determined that: (a) appellants had *failed* to prove by a preponderance of the evidence that at the time the parties entered into the trucking agreement, they intended the term "affiliated entities" to refer only to wholly owned corporate subsidiaries of Bay Cities; (b) appellants had failed to prove by a preponderance of the evidence that the parties intended the option provision to give Morey the right to supply surplus trucking by using trucking companies *other than* his own; (c) appellants had failed to prove by a preponderance of the evidence that they were ready, willing and able to perform *any* trucking services to which they were entitled under the trucking agreement; (d) respondents *did* prove by a preponderance of the evidence that appellants failed to disclose to Bay Cities that Morey was operating his trucking businesses without insurance and while under suspension by the Public Utilities Commission (PUC); and (e) respondents had failed to prove by a preponderance of the evidence that appellants' failure to disclose this information constituted a breach of the trucking agreement.

After jury trial, appellants requested dismissal without prejudice of their remaining bifurcated claims for breach of the batch-out agreement and declaratory relief. The trial court dismissed these causes of action *with* prejudice, and entered judgment for respondents. This appeal followed.

## II. Discussion

■ Appellants contend the trial court erred in submitting to the jury the question of interpreting the term "affiliated entities" as used by the parties in the option provision of the trucking agreement. They insist that the interpretation of this term should have been made by the trial court, not the jury. Alternatively, if the trial court's "delegation" of the question of interpretation to the jury was "permissible," they contend the trial court should have given jury instructions defining the term "affiliated" in accordance with appellants' own requested definition equating the term with corporate ownership or control. Appellants' contentions are incorrect.

Appellants make several significant concessions in their briefs on appeal. Thus, they acknowledge that: (a) the "basic dispute" between the parties at trial concerned the meaning of the term "affiliated entities" as used in the option provision of the trucking agreement; (b) the primary responsibility for interpretation of contractual language lies with the trial court judge, *unless* the language is "ambiguous or uncertain" and its "interpretation turns on an issue of credibility of extrinsic evidence"; (c) the term "affiliated entities" has no "special meaning" in the trucking industry and "is *not* a term commonly used in the construction materials transportation business" (italicis in original); and (d) conflicting extrinsic evidence on the issue of the

parties' interpretation of this term was admitted at trial. Appellants' concessions substantially undermine their case.

■ "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. (Civ. Code, §§ 1635-1656; Code Civ. Proc., §§ 1859-1861, 1864; *Hernandez* v. *Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1814 [34 Cal.Rptr.2d 732]; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 688-689, pp. 621-623.)

■ Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning. (*Pacific Gas & E. Co.* v. *G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39-40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Pacific Gas & Electric Co.* v. *Zuckerman* (1987) 189 Cal.App.3d 1113, 1140-1141 [234 Cal.Rptr. 630].) Indeed, it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face. Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible. (*Pacific Gas & E. Co.* v. *G.W. Thomas Drayage etc. Co., supra,* 69 Cal.2d at p. 40 & fn. 8; *Pacific Gas & Electric Co.* v. *Zuckerman, supra,* 189 Cal.App.3d at pp. 1140-1141.)

Extrinsic evidence is thus admissible to interpret the language of a written instrument, as long as such evidence is not used to give the instrument a meaning to which it is not reasonably susceptible.[4] Where the interpretation of contractual language turns on a question of the credibility of *conflicting*

---

[4]This principle should not be confused with the dictates of the parol evidence rule. That rule of substantive law generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument intended by the parties thereto as the final expression of their agreement. (Code Civ. Proc., § 1856, subd. (a); *Alling* v. *Universal Manufacturing Corp.* (1992) 5 Cal.App.4th 1412, 1433-1434 [7 Cal.Rptr.2d 718]; *Price* v. *Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 486 [261 Cal.Rptr.

extrinsic evidence, interpretation of the language is not solely a judicial function. (Civ. Code, §§ 1647, 1649; Code Civ. Proc., §§ 1856, 1861; *Parsons* v. *Bristol Development Co., supra,* 62 Cal.2d at p. 865; *New Haven Unified School Dist.* v. *Taco Bell Corp.* (1994) 24 Cal.App.4th 1473, 1483 [30 Cal.Rptr.2d 469]; 1 Witkin, Summary of Cal. Law, *supra,* Contracts, §§ 688-689, pp. 621-623.) As trier of fact, it is the jury's responsibility to resolve any conflict in the extrinsic evidence properly admitted to interpret the language of a contract. (*Medical Operations Management, Inc.* v. *National Health Laboratories, Inc.* (1986) 176 Cal.App.3d 886, 891-892 & fn. 4 [222 Cal.Rptr. 455] [where conflicting extrinsic evidence is admitted to interpret language of agreement, the proper procedure is "for the trial court to require the jury to make special findings on the disputed issues and then base its interpretation of the contract on those findings"].)

■ An appellate court is *not* bound by a trial court's construction of a contract where (a) the trial court's contractual interpretation is based solely upon the terms of the written instrument *without* the aid of extrinsic evidence; (b) there is *no conflict* in the properly admitted extrinsic evidence; or (c) a the trial court's determination was made on the basis of *improperly admitted* incompetent evidence. (*Parsons* v. *Bristol Development Co., supra,* 62 Cal.2d at p. 865.) By the same token, however, where the interpretation of the contract turns upon the credibility of conflicting extrinsic evidence which was properly admitted at trial, an appellate court will uphold any reasonable construction of the contract by the trial court. (*Id.* at p. 866.)

■ As applied to the facts before us, these principles are fatal to appellants' case. In order to prevail on their claim that Bay Cities breached the trucking agreement by utilizing the independent nonunion subhaulers before offering excess trucking jobs to Morey, appellants were required to prove by a preponderance of the evidence that the term "affiliated entities" in the option provision meant *only* Bay Cities itself or a wholly owned or controlled corporate subsidiary, and did not extend to the independent subhaulers. By its cross-complaint, Bay Cities directly disputed appellants' proffered interpretation of the term "affiliated entities" and alleged that the

735]; Rest.2d Contracts, § 209, subd. (1); 2 Witkin, Cal. Evidence (3d ed. 1986) Documentary Evidence, §§ 960, 967, pp. 908, 915-916.) The courts have long recognized that even when a contract is integrated—that is, intended to constitute the parties' final and complete understanding of the terms of their agreement—the *meaning* of the terms of the contract must still be ascertained. The California Supreme Court has repudiated the obsolete "plain meaning" component of the parol evidence rule, and permits the admission of extrinsic evidence to interpret the language of an integrated written instrument where such evidence is relevant to prove a meaning to which the contractual language is "reasonably susceptible." (*Pacific Gas & E. Co.* v. *G.W. Thomas Drayage etc. Co., supra,* 69 Cal.2d at pp. 38-40; 2 Witkin, Cal. Evidence, *supra,* Documentary Evidence, §§ 975, 977-978, 983-984, pp. 920-921, 923-924, 929-931.) There is thus no parol evidence issue in this case.

parties intended the term to include the independent subhaulers. At trial, the parties offered extrinsic evidence to support their conflicting interpretations. Appellants never argued that this extrinsic evidence was unnecessary to determine the meaning of the term "affiliated entities," or objected on this ground to the introduction of respondents' testimony.

Thus, on the one hand Morey testified that during negotiations over the provisions of the trucking agreement, respondent Monlux suggested the term "affiliated entities" to cover Bay Cities' wholly owned subsidiary, Bay Cities Transportation, and any other such wholly owned corporate subsidiaries Bay Cities might start up in the future. In directly conflicting evidence, Bay Cities offered the testimony of Bay Cities principals and others to the effect that the parties intended the term "affiliated entities" to include the nonunion independent subhaulers who used their own tractors to pull Bay Cities' trailers. Monlux testified that during negotiations over the trucking agreement, he explicitly told Morey that Bay Cities would not give Morey the right or option to provide trucking services before Bay Cities utilized the independent subhaulers who pulled Bay Cities' own trailers. He explained the Bay Cities transportation system to Morey as including such "affiliated" independent subhaulers, and understood that Morey's own company (CAP) operated in the same fashion. Similar testimony was given by Campagna. Morey himself admitted that CAP handled its trucking needs in an identical fashion to the way Bay Cities did, by using independent nonunion subhaulers. The evidence showed that during the six years following execution of the trucking agreement, Morey *never complained* about the fact Bay Cities continued to use the independent subhaulers before asking Morey to provide excess trucking.

The resolution of this conflicting evidence depended entirely on an assessment of the credibility of the opposing witnesses. This determination was properly made by the jury as trier of fact. Before the disputed contractual language could be interpreted, the jury had to decide whether to believe Morey's testimony that Monlux stated the term referred only to Bay Cities and its wholly owned corporate subsidiaries, or the contrary testimony offered by respondents that the term was used for the express purpose of including the nonunion independent subhaulers. Accordingly, because the question of the interpretation of "affiliated entities" turned on an assessment of conflicting evidence extrinsic to the language of the written trucking agreement itself, the trial court did not err in submitting that question to the jury. (*Medical Operations Management, Inc.* v. *National Health Laboratories, Inc., supra,* 176 Cal.App.3d at pp. 891-892 & fn. 4; 1 Witkin, Summary of Cal. Law, *supra,* Contracts, §§ 688-689, pp. 621-623.)

There is no merit to appellants' alternative assertion that the trial court should have given the additional jury instructions defining "affiliated" as

wholly owned or under the control of Bay Cities. Giving such an instruction on the central disputed issue of fact at the very core of the case would have taken away from the trier of fact the principal question which it had to determine, and would have amounted to a directed verdict for appellants.

A trial court is not required to give instructions on a party's theory of the case unless it is supported by substantial evidence. (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298]; *Byrne* v. *City and County of San Francisco* (1980) 113 Cal.App.3d 731, 737 [170 Cal.Rptr. 302].) The instructions appellants now insist should have been given consisted of definitions of the word "affiliates" taken from PUC regulations, the Federal Securities Act of 1933, the federal Internal Revenue Code, and the California Corporations Code. However, there was no evidence the parties used the term "affiliated entities" with reference to statutes governing securities, taxation, or corporations. To the contrary, all the evidence—including that introduced by Morey himself—indicated that the parties did not consider such outside definitions, but used the term "affiliated entities" simply to delineate the scope of the option granted to Morey to perform surplus trucking for Bay Cities. They only disagreed whether the term was intended to include the nonunion independent subhaulers Bay Cities hired to pull its trailers. In other words, the parties used the term in a context specifically appropriate to the ready-mix concrete transportation business, and no other.

Because there was no evidence the parties discussed, considered, or had any knowledge of the specialized technical definitions contained in appellants' proposed instructions, the trial court did not err in refusing to give those instructions. The proper question in this case was what the parties themselves intended in using the term. That question was for the jury to decide, on the basis of the conflicting testimony and evidence offered by the parties at trial.

### III.  DISPOSITION

The judgment is affirmed. Appellants shall pay respondents' costs on appeal.

Poché, Acting P. J., and Reardon, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 23, 1998.