Filed 3/11/13  Ryu v. Choi CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JAE R. RYU,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BYUNG MOON CHOI,<br><br>    Defendant and Appellant. | B239261<br><br>(Los Angeles County<br>Super. Ct. No. BC417751) |

APPEAL from a judgment of the Superior Court of Los Angeles County.

Mel Red Recana, Judge.  Affirmed in part, reversed in part and remanded.

Law Offices of Andrew Kim, APC and Andrew Kim for Defendant and Appellant.

Law Offices of Eric O. Ibisi and Eric O. Ibisi for Plaintiff and Respondent.

_____

Byung Moon Choi appeals from a judgment entered in favor of Jae R. Ryu following a bench trial on Ryu's action for breach of contract. The judgment awarded Ryu $135,000 in damages. Choi contends that (1) the trial court committed reversible error in failing to issue a statement of decision; (2) the trial court failed to weigh all relevant evidence; and (3) there is no substantial evidence to support the judgment. We affirm in part, reverse in part and remand for a new trial on damages.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Ryu was president of Hunt World Trading Corp., a company engaged in the business of importing handbags manufactured in China. Choi had or owned the rights to certain trademarks for the production of handbags. The parties had entered into two agreements, under both of which Choi granted to Ryu the exclusive use of two trademarks.

This appeal concerns the interpretation of the automatic-renewal clause contained in the second agreement.

### A. The Initial Agreement

On January 27, 2008, Ryu and Choi executed "by mutual e-file" the first agreement (January agreement) which provided: "1. 'A', Byung Moon Choi, agrees and permits that 'B,' Hunt World, uses trademark under the following agreement provisions from 1/22/2008 until 2/28/2009. NUMBER: 3108204/ 3321885." According to Ryu, Choi prepared the initial draft of this agreement which stated at the bottom: "The agreement for the above matter is concluded by mutual e-file."

---

[1]     The material agreements and e-mails submitted by Ryu and Choi are predominantly in Korean with English translations provided.

Ryu testified that Choi had e-mailed him the January agreement for his review. On January 27, 2008, Ryu replied, "I guess we could say the contract would be concluded that way." Attached to Ryu's e-mail was the January agreement. The next day Choi wrote back: "The agreement, according to the attached document, I will finalize the agreement or attached document to be agreed."

## B. The Second Agreement

Five months later, on June 14, 2008, Ryu prepared and he and Choi executed a second agreement (June agreement). This agreement had an initial term of fourteen months, expiring on March 28, 2009, and also contained an automatic-renewal clause

The agreement originally provided: "5. The rightful person, Jae Ryong RYU, Party B shall get the Contract renewed automatically until the year of 2012 unless the termination of this contract is notified in writing. ¶ The amount for renewal of the contract shall be $24,020 and can not be increased by more than 5%." Before he signed the June agreement, Choi made the following modification to paragraph five: "5. The rightful person, Jae Ryong RYU, Party B shall get the Contract renewed automatically until the year of 2011 unless the termination of this contract is notified in writing. ¶ The amount for renewal of the contract shall be $24,020 and can not be increased by more than 5%. The amount of money for renewal of the contract shall be agreed upon otherwise."

## C. Negotiation and Execution of Agreements

At trial, the parties presented conflicting extrinsic evidence concerning the meaning of the renewal provision and the parties' intent relating to the June agreement. Choi testified that when he made the handwritten modification to paragraph five, it was his understanding that the June agreement was not binding on him unless Ryu paid the

3

renewal fee.[2] Specifically, Choi testified that he understood the January agreement to be the final contract between the parties; the June agreement was "just a draft." Choi believed that the June agreement would only become effective upon payment of the renewal fee after the January agreement expired on February 28, 2009.

Choi further testified that at the time of signing, he informed Ryu of this interpretation of the June agreement. In particular, Choi "commented at the time – this paper, this is just request by him he would use that in the future – you may use it; however, you must pay this amount to me. So you must bring the contract paper to me and both sign and then – then it's finished."

Ryu, however, denied having any conversation with Choi in which they agreed that the June agreement required payment of the renewal fee before renewal. To the contrary, Ryu testified that it was his understanding that their contract would automatically renew without any affirmative action by the parties. Ryu also believed that the June agreement was the only contract that existed between the parties. He specifically disputed Choi's testimony that the January exchange of e-mails had resulted in a contract at that time. He recalled receiving an e-mail from Choi that stated something to the effect of "I will take this as finalized, and I will dispose of it as is – with that understanding"; however, Ryu testified that he "didn't buy that argument" because "it was so one-sided." Ryu also testified that he had prepared the June agreement because it was his understanding that any unsigned agreement was void.

### D. Ryu's Manufacturing Project

Ryu testified that on September 9, 2008, he traveled to China and made arrangements "[t]o have the handbags manufactured over there according to the contract," at a cost of $103,000. Ryu stated that he had committed to produce these handbags using Choi's trademarks in reliance on the June agreement. Ryu also stated that he paid an initial deposit of $50,000 to the manufacturer in October, 2008.

---

**2**      Choi does not dispute that he received payment of $24,000 for Ryu's use of the trademarks during the period from January 22, 2008 through February 28, 2009.

4

According to Ryu, production was expected to be completed between April 28 and May 5, 2009.

At trial, Choi specifically disputed that Ryu had manufactured any handbags using the trademarks. Choi testified that prior to February 28, 2009, Ryu did not ever ask him to approve any import or transfer of merchandise to the United States from China; nor did Ryu ever inform him of his commitment to pay over $103,000 to a manufacturer in China. According to Choi, there was "no more contact afterwards" regarding the parties' dealings under the January agreement.

### E. The Renewal Fee

Following execution of the June agreement, the parties next communicated on January 23, 2009, when Ryu sent Choi an e-mail asking for a discount of the renewal fee. The same day Choi replied, "Although the amount was – the amount at the time of contract was $24,000 – since the economy is bad, I would appreciate it if you just pay me $20,000 with cash payment of $15,000 and let's – let the 50 – $5,000 balance be deposited of 30 percent for the next order."

By this time, Ryu had returned to the United States. Ryu testified that after he received Choi's e-mail, he called Choi and requested a meeting with him to discuss the renewal fee. Three days later, on January 26, Ryu met with Choi at his warehouse, where he told Choi about the pending production of handbags in China and promised that he would pay the renewal fee when he got back from China. Ryu stated, "I said I would pay him when I get back from China because the date was January and the renewal date was March and I thought I had some time before having to pay." At that meeting, Ryu also informed Choi that production of the handbags was expected to be completed in April or May, 2009. Ryu testified that Choi "said okay. And then he said he was busy and left."

Ryu then went back to China in February, 2009 and did not return to the United States until May, 2009. Ryu stated that he was unable to return until May "because [he] was busy over there and because of the lunar new year holiday." Ryu further testified that on March 27, 2009, he called Choi from China and promised that he would pay the

5

renewal fee as soon as he returned, but that he was "being held up a little bit." When asked whether at that point Choi had given him any deadline to make the payment, Ryu replied, "No."

Choi disputed this testimony, stating he did not think he saw Ryu in person on January 26. Choi further denied that Ryu ever told him that he would pay the renewal fee when he came back from China.

The parties do not dispute that by March 28, 2009, Choi had not given Ryu any notice of termination. Ryu thus testified that he believed the June agreement automatically renewed for an additional year. Choi, however, disputed this testimony, stating that the June agreement was "cancelled automatically" as of February 28, 2009, due to nonpayment of the renewal fee.

## F. Cancellation Notice

Ryu testified that on April 11, 2009, he received an e-mail from Choi stating that he was cancelling the contract and had given one of the trademarks to another entity. Specifically, Choi's e-mail stated, "Import and custom passing cannot be made," but the merchandise already in the United States could be sold. Choi did not dispute this testimony. Choi testified that on April 11, he informed Ryu by e-mail "[a]bout 38 [trademark], because contract expired on February 28, 2009, you cannot custom import, import by custom, however you can sell your product until June 30, 2009 according to the contract." Choi stated, "I e-mailed to him I may cancel because he did not renew it." At trial, Choi further acknowledged that he had "partially" given one of the trademarks to another party in April, 2009. He stated, "I have the authority to give [to] somebody else, but – because he did not renew it, so I have the authority, so I allowed somebody else to partially use it."

With reference to the April 11 e-mail, Ryu testified that Choi told him, two or three weeks prior to the expected shipment of the handbags, that he "[could] not bring them in." By that time, Ryu was unable to cancel his contract with the manufacturer and receive his deposit back. Ryu further testified that he continued to manufacture the

6

handbags as the project was nearly finished. When production of the handbags was completed, however, he "[had] no choice" but to place them in a warehouse "because [he] could not bring them here."

At trial, Choi maintained that Ryu had not undertaken any such project using the trademarks. Choi did not dispute that on May 5, 2009, Ryu had e-mailed him stating: "In addition, I requested already that you allow me to bring about quantity of two and half container of 38 and one piece of F." According to Choi, however, that was the first time he learned of any merchandise waiting to be imported into the United States. Choi further disputed Ryu's testimony that he had not allowed Ryu to bring in the merchandise from China. He stated, "July [5], 2009, I sent e-mail. I said: The two-and-a-half container full of goods you may import into the United States as you wish."

Ryu did not dispute that the July 5 e-mail contained language to that effect; however, he testified that the e-mail went on to say that Choi "cannot solve the problem of the custom passing." Ryu explained that "custom passing" meant that he would not be able to bring in the products past U.S. Customs. Specifically, Ryu testified that he needed "the signature from trademark owner." He stated, "Without this, I – those product will be taken out."

Between December 2009 and March 2010, the handbags were sold at a close-out sale in China. Ryu testified that if he had been allowed to import the handbags into the United States, he would have earned $30,000 in profits from their sale. Ryu further testified that as of the time of trial, he had paid a total of $95,000 to the manufacturer in China and that a "balance of about $5,000" remained.

### G.  Procedural History

Ryu filed this action for breach of written contract on July 13, 2009, seeking damages in the amount of $200,000. A copy of the June agreement was attached to the complaint. The case was tried to the court, and on September 7, 2011, the trial court announced its tentative ruling for Ryu. Specifically, the court found that "the evidence supported the contention of the plaintiff," and continued, "Therefore, I have to find for

7

the plaintiff against the defendant, Mr. Choi, for the damages being sought by Mr. Ryu in the amount of 103,250 and the $30,000. Choi then orally requested a statement of decision, which the court ordered Ryu to prepare. Instead of preparing a statement of decision, Ryu's attorney submitted a proposed judgment, which the court signed: "Having observed the credibility and demeanor of the witnesses, examined the evidence introduced, considered the parties arguments, the Court enters its judgment as follows: ¶ IT IS ORDERED, ADJUDGED, AND DECREED that ¶ 1. Judgment is for Plaintiff Jae R. Ryu against Defendant Byung Moon Choi on the Breach of Contract cause of action in the amount of $135,000.00."

This timely appeal followed.

## DISCUSSION

Choi first contends that the trial court's failure to render a timely-requested statement of decision was reversible error per se.

### I. Statement of Decision

After a nonjury trial, the doctrine of implied findings requires an appellate court to infer that the trial court made all factual findings necessary to support the judgment, so long as substantial evidence supports those findings. (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462; *Sammis v. Stafford* (1996) 48 Cal.App.4th 1935, 1942.) To assert on appeal that a trial court erred in making or failing to make factual findings, a party must (1) request a statement of decision and (2) bring any ambiguities or omissions to the trial court's attention in a timely manner. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1134; *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.)

Code of Civil Procedure section 632 states: "The request must be made within 10 days after the court announces a tentative decision unless the trial is concluded within one calendar day or in less than eight hours over more than one day in which event the request must be made prior to the submission of the matter for decision. The request for

8

a statement of decision shall specify those controverted issues as to which the party is requesting a statement of decision."

Here, Choi orally requested a statement of decision immediately after the trial court announced its tentative ruling. Although the timing of the request was proper, the request itself did not comply with section 632, as it failed to specify any particular issues to be addressed. Having failed to specify that the statement of decision should address any particular issues, Choi is deemed to have waived his right to object that the trial court failed to make any particular findings. (*City of Coachella v. Riverside County Airport Land Use Com.* (1989) 210 Cal.App.3d 1277, 1292-1293; *Harvard Investment Co. v. Gap Stores, Inc.* (1984) 156 Cal.App.3d 704, 709-711 [a general, nonspecific request for a statement of decision does not operate to compel a statement of decision as to all material, controverted issues].)

Moreover, the record indicates that approximately four months later, the court filed and executed a proposed judgment submitted by Ryu, but at no time did Choi renew his request for a statement of decision or object to the court's error in not issuing one. (See, e.g., *In re Marriage of Cauley* (2006) 138 Cal.App.4th 1100, 1109 [request for a statement of decision waived by not renewing request].) Nor did Choi move for a new trial, or seek to have the judgment vacated under Code of Civil Procedure section 663. It was incumbent upon Choi, who requested the statement of decision, to bring the omission to the attention of the trial court in a timely manner. Because Choi remained silent when the trial court failed to issue a statement of decision, we conclude that Choi waived the request by not renewing it.

In his brief, Choi argues that the "complete absence" of any statement of decision issued by the trial court "precludes" the applicability of waiver and the doctrine of implied findings to this case. In support of this proposition, Choi relies primarily upon *Social Service Union v. County of Monterey* (1989) 208 Cal.App.3d 676 (*Social Service Union*), and *Reid v. Moskovitz* (1989) 208 Cal.App.3d 29 (*Reid*). Both cases are readily distinguishable.

In *Social Service Union*, the appellant timely notified the trial court of an omission in the statement of decision, but the trial court then refused to address the issues contained in the requested finding. (*Social Service Union*, *supra*, 208 Cal.App.3d at pp. 679-681.) The Court of Appeal held that, under those circumstances, there had been no waiver. (*Id.* at p. 681.) Neither of those circumstances is present in this case. As explained above, Ryu never brought any omission to the attention of the trial court, nor did the trial judge ever expressly refuse to issue a statement of decision. Further, the trial court could not have refused to address any requested findings because Ryu never specified any particular issues to be addressed.

Choi's reliance upon *Reid* for the proposition that we cannot imply a finding the trial court refused to make is also inapposite. (See *Reid*, *supra*, 208 Cal.App.3d at p. 32 [When there is no statement of decision and the trial court expressly refuses to make a finding, the appellate court will not presume that the trial court made that finding].) In *Reid*, the record disclosed that the trial court believed the defendant's misrepresentation was negligent, and not intentional. (*Ibid*.) On appeal, therefore, the appellate court refused to presume the punitive damage award was based upon a finding of intentional misrepresentation. (*Ibid.*) Here, however, the trial judge never expressly declined to make any findings on the merit of Ryu's claim. To the contrary, the trial court made an express finding that "the evidence supported the contention of the plaintiff" on his breach of contract claim against Choi. The rule from *Reid*, therefore, has no application to the record before us.

## II. Breach of Contract Claim

Choi next contends that there is no substantial evidence to support the judgment and award of damages to Ryu.

### i. Contract interpretation and the standard of review.

The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636; *Bank of the West v. Superior Court* (1992) 2

Cal.4th 1254, 1264; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 (*Parsons*).)  The court determines mutual intention based on objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent acts and conduct of the parties.  (Civ. Code, §§ 1635-1656; Code Civ. Proc., §§ 1859-1861, 1864; *Universal Sales Corp. v. Cal. Press Mfg. Co.* (1942) 20 Cal.2d 751, 761; *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912 (*Morey*); *Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 851; *Hernandez v. Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1814.)

Extrinsic evidence is admissible to interpret the language of a written instrument, so long as such evidence is not used to give the writing a meaning to which it is not reasonably susceptible.  (*Parsons*, *supra*, 62 Cal.2d at p. 865; *Morey*, *supra*, 64 Cal.App.4th at p. 912; *New Haven Unified School Dist. v. Taco Bell Corp.* (1994) 24 Cal.App.4th 1473, 1483.)  Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage, etc., Co.* (1968) 69 Cal.2d 33, 39-40 & fn. 8; *Morey*, *supra*, 64 Cal.App.4th at pp. 912-913; *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1140-1141.)  Where the interpretation of a contract turns on the credibility of conflicting extrinsic evidence which was properly admitted at trial, an appellate court will uphold any reasonable construction of the contract by the trial court.  (*Parsons*, *supra*, 62 Cal.2d at pp. 865-866; *Morey*, *supra*, 64 Cal.App.4th at p. 913.)

The central issues in this case—the existence of a contract between the parties for Ryu's use of the trademarks, and its breach by Choi—turn almost entirely upon conflicting extrinsic evidence which was properly admitted at trial.  Moreover, because Choi waived his right to a statement of decision with regard to the trial court's judgment, we presume that the trial court made all factual findings necessary to support the

judgment for Ryu, and indulge all inferences in favor of the correctness of its decision. (*In re Marriage of Arceneaux*, *supra*, 51 Cal.3d at p. 1133; *Tusher v. Gabrielsen* (1998) 68 Cal.App.4th 131, 140 (*Tusher*).)  The only issue remaining, therefore, is whether the implied findings of the trial court are supported by substantial evidence in the record. (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792-793; *Tusher*, *supra*, 68 Cal.App.4th at p. 140.)

Choi relies on *Estate of Larson* (1980) 106 Cal.App.3d 560, 567-568 for the proposition that the substantial evidence rule is inapplicable where the trial court failed to weigh all relevant evidence.  Specifically, Choi contends that the trial court improperly found him liable for breach of contract because it failed to consider the fact that the June agreement prohibited Choi "from entrusting the right to use the trademarks to other person than respondent, not to guarantee the import of the merchandises."  Choi points out that the June agreement expressly provided:  "Party A, Byung Moon CHOI shall have no obligation to intervene in everything and anything regarding production, sale, distribution and import."

Choi, however, points to nothing in the record that suggests that the trial court failed to consider and weigh this evidence.  Further, the court's comments demonstrate that it understood the relevant inquiry and considered both sides' evidence.  In effect, therefore, Choi asks us to reweigh the evidence to determine whether Ryu met his burden of proof.  That is not permissible.  (*In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1056 [all issues of credibility are for the trier of fact]; *In re Marriage of Kirk* (1990) 217 Cal.App.3d 597, 606 [appellate court should not substitute its own judgment for that of the trial court; its review is limited to the discovery of substantial evidence in support of the trial court's decision].)  Accordingly, we apply the substantial evidence rule in the usual manner:  we review the entire record in the light most favorable to the judgment to determine whether there are sufficient facts, contradicted or uncontradicted, to support the judgment.  (*Campbell v. Southern Pacific Co.* (1978) 22 Cal.3d 51, 60.) Substantial evidence is evidence that is reasonable and credible.  (*Kuhn v. Department of General Services*, (1994) 22 Cal.App.4th 1627, 1633.)  In evaluating the evidence, we

12

accept reasonable inferences in support of the judgment and do not consider whether contrary inferences may be made from the evidence. (*Id.* at pp. 1632-1633.) We may not substitute our view of the credibility of witnesses for that of the trier of fact, and may only reject testimony "'when it is inherently improbable or incredible, i.e., "'unbelievable *per se*,' "physically impossible or" 'wholly unacceptable to reasonable minds.'" [Citations.]' [Citation.]" (*Lenk v. Total-Western, Inc* (2001) 89 Cal.App.4th 959, 968 (*Lenk*).)

### ii. Substantial evidence supports the trial court's findings that Choi both entered into and breached a contract with Ryu.

Ryu testified that it was his understanding that the June agreement was the only contract that existed between the parties because it was the only contract regarding his use of the trademarks that he had signed with Choi. Ryu, who negotiated and drafted the June agreement, also testified that the terms of the written agreement were intended to provide for automatic renewals in the absence of any notice to the contrary. He specifically disputed extrinsic evidence that at the time of contracting, the parties had agreed that his right to renewal of the contract would be dependent upon payment of the renewal fee stated in the agreement. Ryu acknowledged that prior to signing, Choi had made two changes to paragraph five: "The year 2012 was crossed out and changed to 2011," and at the end Choi wrote in, "In –in that the money at the time of contract is subject to separate agreement." According to Ryu, however, the parties did not discuss any other change to this contractual provision. Ryu further testified that Choi never made any demand for payment following execution of the June agreement, even when he informed Choi at their January 26 meeting that production of the handbags was expected to be completed in April or May, 2009.

Ryu's testimony, believed by the trial court, is sufficient to support the trial court's implied finding that in the absence of any written notice of termination, the contract was automatically renewed. (*In re Marriage of Birnbaum* (1989) 211 Cal.App.3d 1508, 1513.)

13

There was also substantial evidence of breach. Ryu testified that on April 11, 2009, he received an e-mail from Choi stating that he was cancelling the contract and had given one of the trademarks to another party. Choi admitted that in April, 2009, he had "partially" given away the right to use that trademark. Ryu further testified that he was never able to bring in the merchandise between April and May, 2009 "because Mr. Choi cancelled the agreement." Specifically, Ryu testified that when he asked Choi "to allow [him] to bring in two-and-a-half containers and sell them," Choi "said he didn't have a right to import them and sell them." According to Ryu, the reason why Choi said that to him was "[b]ecause somebody – he gave the right to use the trademark to somebody else." Ryu also stated, "I tried several times. I talked to him. Every time I called him, he told [me] I could not bring them in," and continued, "Besides there are some e-mails also." In particular, Ryu pointed out that on April 11, 2009, Choi "wrote custom passing – import custom passing cannot be made." Later, in a July 5, 2009 e-mail to Ryu, Choi reiterated, "I cannot solve the problem of the custom passing." Ryu explained that "custom passing" meant that he would not be able to bring in the merchandise past U.S. Customs.

The trial court was entitled to judge the credibility of the witnesses and to believe Ryu, and disbelieve Choi. The credibility of witnesses is a matter for the trier of fact, not for the appellate court, and Ryu's testimony was not impossible or unbelievable. (*Lenk*, *supra*, 89 Cal.App.4th at p. 968.) Accordingly, we will not disturb the trial court's credibility determination on appeal.

### iii. There is not substantial evidence in support of the amount of the damages award.

"Damages awarded to an injured party for breach of contract 'seek to approximate the agreed-upon performance.' [Citation.] The goal is to put the plaintiff 'in as good a position as he or she would have occupied' if the defendant had not breached the contract. [Citation.] In other words, the plaintiff is entitled to damages that are the equivalent to the benefit of the plaintiff's contractual bargain. [Citations.]" (*Lewis Jorge*

14

*Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 967-968.) Damages, however, must be "clearly ascertainable in both their nature and origin" (Civ. Code, § 3301), and must be causally connected to the breach. (Civ. Code, § 3300.)

"Damage awards in injury to business cases are based on net profits. [Citation.]" (*Electronic Funds Solutions, LLC v. Murphy* (2005) 134 Cal.App.4th 1161, 1180.) """Net profits are the gains made from sales 'after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed.' [Citation.]"' [Citations.] A plaintiff must show loss of net pecuniary gain, not just loss of gross revenue. [Citations.]" (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 884 (*Kids' Universe*).) "'Lost profits to an established business may be recovered if their extent and occurrence can be ascertained with reasonable certainty; once their existence has been so established, recovery will not be denied because the amount cannot be shown with mathematical precision.' [Citations.]" (*Resort Video, Ltd. v. Laser Video, Inc.* (1995) 35 Cal.App.4th 1679, 1697-1698.) "It is enough to demonstrate a reasonable probability that profits would have been earned except for the defendant's conduct. [Citations.] The plaintiff has the burden to produce the best evidence available in the circumstances to attempt to establish a claim for loss of profits. [Citations.]" (*S.C. Anderson, Inc. v. Bank of America* (1994) 24 Cal.App.4th 529, 535.)

The record indicates that Ryu had been in the handbag business for 22 years and was unable to import and sell the manufactured handbags in the United States due to Choi's breach. Ryu testified that if he had been allowed to bring the handbags into the United States, he would have earned $30,000 in profits from their sale. Ryu further testified that at the time he received the April 11 notice of cancellation, he was unable to cancel his contract with the manufacturer and receive his initial deposit back.

At trial, Ryu presented copies of wire transfer documents as evidence that he had made three payments totaling $95,000 to the manufacturer in China. He acknowledged that the person who was named as the beneficiary for the account was his wife; however, he testified that for each of the three payments, "the entire amount was to go to the

15

manufacturer." Ryu explained, "If I mail it to the factory directly, there is a risk, and I cannot get a receipt. And if I send it to my wife, she speaks Chinese, and she can pay and get a receipt." Ryu testified that as of the time of trial, he had a "balance of about $5,000" remaining. Ryu also testified that when the handbags were ultimately sold at a close-out sale in China, he earned only one-tenth of his anticipated net profit.

The evidence presented by Ryu is sufficient to support the trial court's implied finding that Ryu suffered compensable damages as a result of Choi's breach of the agreement. However, to recover, Ryu had to prove what he lost in *net* profits, i.e., the amount he would have earned if he had sold the products in the United States, after deducting all costs. Here, Ryu merely testified as to: $95,000 in production costs, with a $5,000 balance remaining, and $30,000 in lost profits. (See *Kids' Universe*, *supra*, 95 Cal.App.4th at p. 884 [Proof of lost gross revenue is insufficient].) Further, there was evidence that Ryu had received some return from selling the goods in question, which the trial court was required to offset against the award to Ryu. (*Avery v. Fredericksen & Westbrook* (1944) 67 Cal.App.2d 334, 336 [One injured by the breach of a contract is entitled to a just and adequate compensation for such injury, but no more]; see also *Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 468 ["The damages award should, insofar as possible, place the injured party in the same position it would have held had the contract properly been performed, but such damage may not exceed the benefit which it would have received had the promisor performed"].) From the record, Ryu presented no evidence as to the amount he had realized from the sale. In the absence of such proof, the damages award cannot be upheld.

In sum, although the trial court correctly determined that Ryu sustained damage from his inability to import and sell the merchandise in the United States, the evidence does not support the award made. Accordingly, the matter is remanded for a new trial confined to the issue of damages.

16

**DISPOSITION**

The judgment is reversed as to damages, and the matter is remanded for a new trial on damages.  In all other respects, the judgment is affirmed.  Appellant is to recover his costs on appeal.

ZELON, J.

We concur:

WOODS, Acting P. J.

JACKSON, J.