Filed 10/25/13  R. Lawson Enterprises v. Dole Fresh Vegetables CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| R. LAWSON ENTERPRISES, LLC, | C070740 |
| Plaintiff and Appellant, | (Super. Ct. No. CV031798) |
| v. | |
| DOLE FRESH VEGETABLES, INC., | |
| Defendant and Respondent. | |

In this case for breach of contract and fraud, the trial court ruled that the interpretation of the contract at issue would be tried first to the court before the trial of the remaining issues before the jury.  Ultimately, however, the trial court interpreted the contract in ruling on an in limine motion, then granted another in limine motion to exclude evidence of an appraisal the plaintiff wanted to offer because the appraiser had not followed the terms of the contract as the court had interpreted it.  The plaintiff conceded that it could not prove its case without the excluded evidence.  The defendant then moved for nonsuit, which the court granted.

On appeal, the plaintiff contends the trial court erred in granting a separate court trial on the interpretation of the contract, erred in its interpretation of the contract, and

1

erred in excluding the plaintiff's appraisal evidence based on the erroneous interpretation of the contract. Finding no merit in any of these arguments, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In June 1999, Robert Lawson[1] contracted to purchase from Dole Bakersfield, Inc., approximately 22 acres of rural land in San Joaquin County on which the company had operated a cherry packing facility used in the manufacture of maraschino cherries, which involves the use of brine.[2] The property included approximately 1.5 acres that had been used for percolation ponds into which wastewater from the brining was discharged. Lawson bought the property intending to use it to grow grapes and as a winery.

As part of the purchase agreement, the seller agreed that if any environmental agency ever contended the discharges into the ponds had adversely affected groundwater, the seller would indemnify and hold the buyer harmless from "any costs of closure, remediation or other cost . . . incurred in connection with, or arising from, any legal obligation to take corrective action with regard to [the] percolation ponds."

The seller's obligations under the purchase agreement were apparently later assigned to defendant Dole Fresh Vegetables, Inc. (Dole). The buyer's rights under the agreement were apparently assigned to Wild Rose Vineyards LLC (Wild Rose). (Robert Lawson was president of Wild Rose.)

In August 2004, a cleanup and abatement order was issued to Dole and Wild Rose ordering them to "close" the wastewater ponds. One potential method of closing the

---

[1]     To the extent there is no reason for distinguishing between them, we will refer to Robert Lawson and the limited liability company he manages, plaintiff R. Lawson Enterprises, LLC, interchangeably as Lawson. When it is necessary to refer to Robert Lawson in particular, we will use his full name.

[2]     "The modern maraschino cherry is soaked in a salt brine to remove its natural color and flavoring," "then pitted and soaked in a sweetener," then "dipp[ed] in artificial coloring." (http://cocktails.about.com/od/embellishments/p/maraschino_cherry.htm)

2

ponds involved putting a limited deed restriction on the area of the ponds, precluding the land from ever being used to grow crops or otherwise irrigating the land. At some point, the parties began negotiating over how much Dole would pay Wild Rose for the deed restriction.

On May 5, 2005, Dole faxed a letter to Robert Lawson proposing that in exchange for the limited deed restriction, Dole would place $150,000 in escrow pending an appraisal by Randy Edwards of the fair market value of the land to be restricted. The land was to be "valued as if [it] had no environmental issues and no deed restrictions, constituted a separate parcel and could only be used for agricultural purposes." Dole explained that Edwards "would be looking at the value, on a per acre basis, of comparable land, in the same general vicinity, that can be used only for agriculture, on the theory that you would use the proceeds from Dole to purchase replacement land for growing crops." If the appraised value was less than $150,000, the amount would be paid from the escrow; if it was more, Dole would make up the difference. The appraised amount would be final and binding on all parties.

That same day (May 5), Robert Lawson sent a counteroffer to Dole that varied the terms of the proposed appraisal. Under the counteroffer, an agreed-upon escrow agent would choose a qualified independent appraiser who would "determine the fair market value of the deed restricted property, valued as if the property had no environmental issues and no deed restrictions, [and] constituted a separate parcel in an area zoned AG-40 (agriculture zoning minimum 40 acres)." The appraiser "would value based on property from comparable land of the same area, similar zoning, etc."

On May 6, 2005, Dole responded to the counteroffer. In its response, Dole agreed the land would be appraised by an independent appraiser in the Stockton-Lodi area who would appraise it as if it constituted a separate parcel in an area zoned AG-40. Dole continued to insist, however, that the appraised value would be "based on property from comparable land, in the same general vicinity, with the same zoning that can only be used

3

for agriculture." Dole proposed that the appraiser would be chosen, not by the escrow agent, but by each party faxing the other a list of three appraisers within five days of delivery of the escrow agreement. If there was a name in common on the two lists, then that person would be the appraiser. If there was more than one name in common, the appraiser would be the person whose last name came first in the alphabet. If there were no names in common, then each party would select one appraiser, and those two appraisers would select a third appraiser who was not on either of the lists, and that person would be the appraiser for purposes of valuing the land.

Robert Lawson responded to Dole's May 6 letter with one of his own dated May 9. The May 9 letter included the following statement: "In regards to the phrase in your 5-6-2005 offer 'that can be used only for agri[c]ulture', such property does not exist in general. We, therefor[e], cannot go out and purchase such a parcel. If this phrase is removed and our engineering cost recovered I will agree to your proposal."

On May 23, 2005, Dole faxed Lawson a final offer that both parties ended up signing. That agreement provided in pertinent part as follows:

1) Dole would place $150,000 in an escrow "pending appraisal by an independent appraiser in the Stockton-Lodi area of the fair market value of the Deed Restricted Property, valued as if the property had no environmental issues, was not subject to the Limited Deed Restriction and constituted a separate parcel in an area zoned AG-40."

2) "In appraising the Deed Restricted Property, the appraiser would value based on property from comparable land, in the same general vicinity, zoned AG-40. The appraiser will not consider as comparable any land (1) that is near to a developed parcel, (2) as to which any rezoning request or any development plan or proposal has been submitted, (3) as to which rezoning is being considered by the applicable governmental authority or (4) a substantial portion of the value of which reflects prospects for rezoning and development."

4

3) "The reason for the restrictions set forth in the [preceding] paragraph is so that we can have an apples-to-apples comparison, as the Limited Deed Restriction only requires you to forego crop-growing uses of the Deed Restricted Property. This is the only approach consistent with your claim that you need the proceeds from Dole to purchase land for growing crops to replace the Deed Restricted Property. We will not pay you for the added value of land that comes from its being convenient for development, since the Limited Deed Restriction does not in any way restrict you from developing the Deed Restricted Property."

4) "The appraiser will use this agreement as instructions for the appraisal."

The agreement went on to provide for selection of the appraiser in the manner first set forth in Dole's May 6 letter.

On June 6, 2005, the parties entered into the escrow agreement provided for in the May 23 agreement. (The escrow agreement identifies the party on Lawson's side of the deal as R. Lawson Enterprises, LLC, d/b/a WildRose Vineyard.) For whatever reason, in the five days that followed, neither side faxed the other the required list of three appraisers. Over eight months later, in February 2006, Lawson submitted a list of three appraisers to the title company that was serving as the escrow agent. Dole apparently did nothing.

In the summer of 2006, Lawson engaged one of the appraisers on its list, Bruce Willmette, to appraise the property. Instead of giving Willmette the May 23 agreement as instructions for the appraisal, however, Lawson gave him the May 5 counteroffer. Most significantly, that counteroffer did not contain the language from the May 23 agreement regarding the types of property that could not be considered comparable.[3]

---

**3** "The appraiser will not consider as comparable any land (1) that is near to a developed parcel, (2) as to which any rezoning request or any development plan or proposal has been submitted, (3) as to which rezoning is being considered by the

5

Willmette produced a written appraisal report in which he appraised the property at $250,000 effective July 11, 2006. In reaching this valuation, Willmette determined that "the highest and best use of the site, as if vacant, would be for rural residential utilization." Accordingly, in seeking to identify sales of comparable properties, he "search[ed] for approximate 1.65-acre sites suitable for building a residence."

On August 10, Lawson's attorney sent the appraisal to Dole and demanded release of the $150,000 and payment of an additional $100,000. Dole's response, if any, does not appear in the record. Whatever happened, it did not resolve the matter because in February 2007 Lawson commenced the present action by filing a complaint for breach of contract and fraud against Dole.[4]

In September 2008, Dole took Willmette's deposition. At the same time, with the trial in the action set for December, the trial court issued a trial management order that authorized the parties to file motions in limine regarding legal issues on the law and motion calendar prior to the start of trial. In October 2008, Dole filed a motion that, as relevant here, requested a separate court trial "on issues relating to construction of the appraisal instructions and valuation provisions of the underlying contract." Dole argued the contract was "clear and unambiguous" and thus its construction was "a pure question of law for the Court to determine."

In opposing the motion, Lawson asserted that it intended to offer extrinsic evidence "regarding the meaning of the words used in th[e] contract" and "regarding whether the agreement is reasonably susceptible to the particular meaning advanced" but

---

applicable governmental authority or (4) a substantial portion of the value of which reflects prospects for rezoning and development."

[4] The fraud claim was based on the premise that Dole never intended to compensate Lawson for the fair market value of the property subject to the deed restriction. Thus, it was essentially a claim of promissory fraud.

admitted that it had "no way of knowing whether [Dole] intends to offer extrinsic evidence."

In November 2008, the trial court granted Dole's motion, ordering that the court trial on the issue of contract interpretation would be held on the first scheduled trial date, with the jury trial of the remaining issues to follow.

The matter was not tried in December 2008; instead, the trial was continued several times for various reasons. Eventually, trial was set for June 21, 2010. In advance of that trial date, in May 2010 Lawson filed a motion in limine to preclude Dole's expert witness, Robert Arnold, from testifying as to the value of the property because, according to Lawson, Arnold's method of valuing the property was inconsistent with the May 23 agreement. For its part, Dole filed its own motion in limine to preclude Lawson from offering expert opinion testimony from Willmette regarding the value of the property because Willmette had been provided with the wrong appraisal instructions and had used residential and/or developed parcels as comparable properties/sales when he should have used only agricultural parcels.

Originally, the hearing on the motions in limine was set for June 11, 10 days before trial. For some reason, however, not made clear by the record or the parties, the motions were not resolved on that date but were continued to the trial date.

Three days before trial, on June 18, Lawson filed a motion to continue the trial on the ground that he had just discovered the day before that Willmette's license as a real estate appraiser had been revoked in October 2009 due to three misdemeanor convictions for possessing child pornography. Lawson's attorney asserted that "even if [he] was prepared to call one convicted of possessing child pornography as a witness, to do so would likely be to cause the commission of a crime," namely, "real estate appraisal activity by a person without a license." Accordingly, he had to move for a continuance "to obtain a new appraiser."

7

On June 21, the court vacated the trial date and scheduled a trial setting conference for September. Meanwhile, the parties agreed "to have a motion in limine hearing regarding contract interpretation" on July 28. As the court later explained, the court was "to determine by this motion in limine the *contract terms for the methodology* to be used by the appraiser in opining on the fair market value that Dole is to compensate Lawson for the Deed Restricted portion of the property in question." The parties apparently believed "it would be fruitful in resolving the case to have [the court] tell [them] what the contract meant," and they "agreed [the court] should make that interpretation."

In advance of the July 28 hearing, the parties stipulated that the trial court could consider the following documents "to interpret the appraisal instructions of the 5/23/05 contract in question": (1) an aerial photograph of the property; (2) the May 5, 2005 letter from Dole to Lawson; (3) the May 5, 2005 letter from Lawson to Dole; (4) the May 6, 2005 letter from Dole to Lawson; and (5) the May 23, 2005 agreement. The parties apparently also agreed that the court could consider various excerpts of certain deposition transcripts.[5]

On July 28, the court issued a tentative ruling, setting forth the various terms from the agreement regarding the conditions of the appraisal and concluding that it was "clear from the language in the letter agreement that the parties intended that agricultural land rather than residential property be considered as a basis for the appraisal." Lawson requested a hearing on the tentative ruling, "not so much [for] what was in the . . . ruling, but [for] something [he] did not find." Noting that there had originally been two motions

---

[5] For some reason, Robert Lawson's letter of May 9, 2005, was not among the documents the parties agreed the court could consider at this point in the proceedings. Later, however, in connection with the dispositive motion for nonsuit that followed the in limine ruling excluding evidence of Willmette's appraisal, Lawson offered the May 9 letter as part of its offer of proof as to what the evidence at trial would have been, so that there would be "a full record on appeal to be able to show what we would have proved had the Court not ruled the way it did."

8

in limine before the court -- one of which was now moot because Willmette "can't testify" -- Lawson noted that the motion to exclude Arnold's testimony had been based on the fact that Arnold "look[ed] at large vineyards or ranches" in making his valuation, and Lawson wanted to be sure that the court's ruling made it clear that what "the appraiser was supposed to look at was a separate parcel, an acre and a half separate parcel in an AG-40 zone." The court instructed Dole's attorney to "add that part in" in preparing the formal order. Accordingly, in August, the court ruled that "[t]he letter contract requires appraisal for agricultural uses not residential" and "[the l]etter contract requires appraisal of approximately 1.5 acres as a separate parcel."

Eventually the case was set for trial on December 5, 2011. In advance of that trial date, Dole filed a number of motions in limine, including a motion to exclude Willmette's appraisal report from evidence. Based on the belief that Willmette would "not be available to testify at trial due to a recent criminal conviction," Dole argued that Willmette's appraisal report would "lack foundation" and was "irrelevant" because Willmette "failed to follow [the] criteria" in the May 23 agreement (as interpreted by the court in its August 2010 order). Dole also argued that Willmette's appraisal report would be inadmissible hearsay evidence and could not be authenticated.

For its part, Lawson filed a motion in limine seeking to preclude any revelation to the jury that Willmette's appraisal license was revoked because he was convicted of possessing child pornography.

On the first day of trial on December 5, the court and the parties began with a conference on the motions in limine. Lawson's attorney said that he intended to offer Willmette's deposition into evidence under Code of Civil Procedure section 2025.620 on the ground that Willmette was unavailable to testify. In ruling on Lawson's motion in limine, the court decided that in advance of Willmette's deposition being read to the jury, the jury would be told that Willmette was no longer a licensed appraiser, had not practiced since 2009, and was, therefore, unavailable as a witness.

9

The court then turned to Dole's motion to exclude the evidence of Willmette's appraisal. The court told the parties its tentative ruling was to grant the motion on the grounds that (1) Willmette's appraisal was irrelevant because it "was not based on the parameters of our case facts" in that it "was based on residential use of the property," (2) there would be a lack of foundation without Willmette testifying, and (3) there would be "authentication problems with Willmette's actual appraisal report which would also, most likely, implicate inadmissible hearsay."

In responding to the tentative ruling, Lawson argued that even though Willmette did not have the May 23 agreement to work from and therefore did not have before him the language regarding the types of property that could not be considered comparable in completing the appraisal, Lawson intended to offer the testimony of another appraisal expert who would testify that he looked at the comparables Willmette used and all of them were consistent with the criteria in the May 23 agreement. As for the issues of foundation and authentication, Lawson argued that Willmette testified to his qualifications and authenticated his appraisal report at his deposition. Additionally, Robert Lawson would be able to authenticate the appraisal report as the one he received from Willmette and sent to Dole.

In response, Dole's attorney complained that without Willmette testifying, he could not "cross-examine [Willmette] as to his qualifications or the basis for his opinion" but would be "stuck with the deposition."[6] Lawson replied that Dole was able to cross-examine Willmette at his deposition. Dole then argued (for the first time) that Willmette was not unavailable; he just did not want to testify. Dole also complained that Willmette

---

[6] The attorney who took Willmette's deposition for Dole was not the same attorney who appeared at trial for Dole. Thus, this complaint appears to have been personal to the attorney who appeared at trial, i.e., *he* would be stuck with the deposition conducted by his predecessor.

"said the highest and best use [that he was] using to value this property [wa]s rural residential," and the court "subsequently said that is not right."

The trial court likened the situation to an eminent domain proceeding, where the testimony of an appraisal expert is subject to exclusion if the expert did not follow a legally required valuation formula. The court then said, "Now, if my prior ruling in this case was wrong -- and it may be -- everything thereafter is going to be wrong. . . . I'm basing subsequent motions in limine rulings in part on that earlier one. And, yes, if I was wrong upstream, I'm going to be still wrong downstream, because I'm basing it on my prior ruling. That's where I'm finding Wil[l]mette's valuation is not in accordance with what I found to be the parties' agreement." The court then ruled that "Wil[l]mette's appraisal would not be helpful to the jury. And, in part, it is based on what I previously have ruled already as to what the proper parameters were for the appraisal in this case. [¶] So I am granting Defense motion in limine number one."

Lawson conceded that it could not prove its case without Willmette's appraisal. Dole then moved for nonsuit. The court granted nonsuit in favor of Dole and entered judgment against Lawson in January 2012. Lawson timely appealed.

DISCUSSION

I

*Order For Separate Trials*

Lawson contends the trial court erred in granting Dole's motion for a separate court trial on the issue of contract interpretation. According to Lawson, the court's order must have been based on the premise that Lawson was not entitled to offer extrinsic evidence of an interpretation of the agreement to contradict the interpretation advanced by Dole. Because Lawson intended to offer such evidence, he contends the proper procedure would have been "for the trial court to require the jury to make findings on disputed issues and base its interpretation of the contract on those findings."

11

Dole argues that the separate trials ruling was not an abuse of discretion because "in opposing the motion, Lawson did not point to any purportedly conflicting evidence giving rise to an issue triable to a jury. Instead, it merely speculated that the parties might offer conflicting extrinsic evidence bearing on the meaning of the parties' agreement." We agree.

The role of a jury in the interpretation of a written agreement is limited. "Where the interpretation of contractual language turns on a question of the credibility of *conflicting* extrinsic evidence, interpretation of the language is not solely a judicial function. [Citations.] As trier of fact, it is the jury's responsibility to resolve any conflict in the extrinsic evidence properly admitted to interpret the language of a contract." (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912-913.) "[T]he proper procedure is 'for the trial court to require the jury to make special findings on the disputed issues and then base its interpretation of the contract on those findings.' " (*Id.* at p. 913.)

Here, while Lawson asserts that it intended to offer extrinsic evidence to assist in the interpretation of the agreement, Lawson fails to show that there was going to be a *conflict* in the extrinsic evidence requiring the involvement of a jury. On appeal, Lawson asserts that Dole would have *had* to offer extrinsic evidence to support its construction of the agreement, and thus the extrinsic evidence Lawson intended to offer in support of *its* construction of the agreement would have been "contradictory." But there was nothing in Dole's motion for separate trials that suggested Dole intended to offer *any* extrinsic evidence regarding the proper interpretation of the agreement, let alone extrinsic evidence that would be contradictory to evidence to be offered by Lawson. Instead, Dole expressly argued that the terms of the writing were "clear and unambiguous" and thus "construction of it is a pure question of law for the Court to determine." In opposing the motion, moreover, Lawson admitted that it had "no way of knowing whether [Dole] intend[ed] to offer extrinsic evidence regarding the meaning of the words used in this contract, or

12

regarding whether the agreement is reasonably susceptible to the particular meaning advanced."

In the absence of any reason for believing there was going to be conflicting extrinsic evidence bearing on the proper interpretation of the agreement, the trial court acted within its discretion in ruling that the interpretation of the agreement would be subject to a court trial to be held before the jury trial on the remaining issues.[7]

## II

### *Interpretation Of The May 23 Agreement*

Lawson contends the trial court erred in ruling that the May 23 agreement required appraisal for agricultural uses not residential. We disagree.

"An appellate court is not bound by a trial court's construction of a contract where (a) the trial court's contractual interpretation is based solely upon the terms of the written instrument without the aid of extrinsic evidence; (b) there is no conflict in the properly admitted extrinsic evidence; or (c) the trial court's determination was made on the basis of improperly admitted incompetent evidence." (*Morey v. Vannucci, supra,* 64 Cal.App.4th at p. 913, italics omitted.) Here, because there is no conflict in the extrinsic evidence the trial court considered in construing the agreement, we interpret the agreement de novo. In doing so, our goal is "to give effect to the mutual intention of the parties" (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264), which "is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object,

---

[7]     As it turned out, the parties did not offer any conflicting extrinsic evidence and ended up stipulating to the court determining what the contract meant without any assistance from a jury.

13

nature and subject matter of the contract; and the subsequent conduct of the parties." (*Morey*, at p. 912.)

We begin with the words used in the agreement. The May 23 agreement provided that the appraiser was to determine "the fair market value of the Deed Restricted Property, valued as if the property had no environmental issues, was not subject to the Limited Deed Restriction and constituted a separate parcel in an area zoned AG-40." The agreement further provided that, "[i]n appraising the Deed Restricted Property, the appraiser would value based on property from comparable land, in the same general vicinity, zoned AG-40. The appraiser will not consider as comparable any land (1) that is near to a developed parcel, (2) as to which any rezoning request or any development plan or proposal has been submitted, (3) as to which rezoning is being considered by the applicable governmental authority or (4) a substantial portion of the value of which reflects prospects for rezoning and development." Finally, the agreement explained that "[t]he reason for the [foregoing] restrictions [on comparables] is so that we can have an apples-to-apples comparison, as the Limited Deed Restriction only requires you to forego crop-growing uses of the Deed Restricted Property. This is the only approach consistent with your claim that you need the proceeds from Dole to purchase land for growing crops to replace the Deed Restricted Property. We will not pay you for the added value of land that comes from its being convenient for development, since the Limited Deed Restriction does not in any way restrict you from developing the Deed Restricted Property."

Lawson contends that, contrary to the trial court's ruling, the foregoing language did not require the appraiser to determine the value of the property by reference to other properties that could be used *only* for agricultural purposes, as opposed to also being suitable for the construction of a single family residence. In Lawson's view, the prohibitions on the consideration of land "near to a developed parcel," land subject to a "rezoning request or any development plan or proposal," land "being considered [for

14

rezoning] by the applicable governmental authority," or land the value of which substantially reflects "prospects for rezoning and development," were intended to "prevent LAWSON from receiving a 'windfall' should an appraiser find DOLE'S apparent 'bogeyman;' i.e., a 1.5 acre parcel near a 'shopping center,' or 'major residential subdivision.' " According to Lawson, by construing the concept of "development" to include the construction of even a single family residence, the trial court subverted the intended meaning of the contract, because "[a]fter twice negotiating the 'used only for agriculture' provision out of their agreement, here the Court, as a matter of law, put it back in." Lawson also contends "[t]he Trial Court's interpretation is a directive to do the impossible - appraise a 1.5 acre parcel in a rural agricultural AG-40 zone, suitable only 'for agricultural use, not residential,' when there is no dispute that 'such property does not exist.' "

For its part, Dole contends the May 23 agreement is "not reasonably susceptible to Lawson's urged interpretation that the deed restricted property could be valued as residential property." According to Dole, "[t]he agreement . . . provided that Dole would not pay Lawson for the added value of land that comes from its being convenient for development because the deed restriction did not prevent Lawson from developing the property. . . . Thus, under the agreement Lawson was not entitled to compensation for the loss of uses that it had not sustained, including the construction of a residence."

We believe Dole has the better argument here. Based on the idea that the purpose of the agreement was to provide Lawson with "the amount necessary for [it] to acquire a comparable 1.5 acre property," Lawson takes the position that the appraiser could consider as comparable land on which a single family residence could be built because land suitable *only* for agricultural use, not residential use as well, " 'does not exist.' " In support of this proposition, Lawson cites a statement of its own in the May 9 letter to Dole, where Lawson asserted that land that can be used only for agriculture "does not

15

exist in general. We, therefor[e], cannot go out and purchase such a parcel." The record, however, does not bear out this assertion.

In the very appraisal report Lawson wanted to offer into evidence, Willmette stated as follows regarding the property being valued: "The site is zoned AG-40, general agriculture with a 40-acre minimum lot size. Like many sites of this size zoned AG-40 *it may or may not be legally buildable for a single family residence, dependent upon how and when the separate parcel was created.* Newly created 1.65 acre sites would typically be zoned R-R, rural residential by San Joaquin County, but existing sites of that size, with and *without residences* do exist in AG-40 zone areas. *Access is a primary consideration when a building permit is requested.*" (Italics added.)

Willmette's appraisal report clearly implies that there may be parcels in the AG-40 zone that are of comparable size to the subject property that are *not* "legally buildable" because of lack of access or some other reason related to how and/or when the parcel was created. This contradicts Lawson's assertion that "a 1.5 acre parcel in a rural agricultural AG-40 zone, suitable only 'for agricultural use, not residential,' . . . 'does not exist.' " On this record, Lawson has not shown that there is no such thing as a 1.5-acre parcel zoned AG-40 on which a single family residence cannot be built and thus is suitable only for agricultural use.

Accepting the premise that the purpose of the agreement was to give Lawson enough money to purchase land for growing crops to replace the deed restricted property that could not be put to that use, and based on the clear implication from the evidence that comparable property suitable only for agricultural use *could* be found within the same general vicinity, we find no error in the trial court's determination that the May 23 agreement required appraisal for agricultural uses not residential. And we do not find any inconsistency between this conclusion and the omission from the final agreement of the limiting phrase, "that can be used only for agriculture," which Lawson finds so significant. It is true that limiting phrase, which appeared in previous versions of the

16

agreement drafted by Dole, was omitted from the final agreement, but it was replaced by the language regarding "development" and "rezoning."

To the extent Lawson contends the extrinsic evidence shows that the "development" and "rezoning" language was intended to preclude consideration only of properties "next to a 'shopping center or a big residential subdivision,' or 'commercial development,' " we disagree. The witness on whose deposition testimony Lawson's argument is based (Sanjeev Tandon, who negotiated the agreement for Dole) testified that "[t]he general principle underlying this [added language] was that our intention was to compensate Mr. Lawson for comparable agricultural land . . . , land to be used for agricultural purposes." Tandon testified further that Dole was "going to compensate [Lawson] for a comparable agricultural 1.5 acres" and that it was his "contemplation that an appraiser would go out, scour the immediate vicinity and try to find acre-and-a-half parcels that were similar to this one." He further testified that "[t]he spirit of the letter was to provide Mr. Lawson fair compensation for -- for comparable agricultural land and . . . the idea was to provide him with fair compensation for agricultural land." Thus, Tandon's deposition testimony was consistent with the trial court's conclusion that the appraisal was to be for agricultural uses not residential.

In summary, we find no error in the trial court's interpretation of the May 23 agreement.

III

*Exclusion Of Evidence Of Willmette's Appraisal*

In his final claim of error, Lawson contends the trial court erred in entering a judgment of nonsuit based on its exclusion of evidence of Willmette's appraisal because the exclusion of that evidence was error. Again, we disagree.

17

"A trial court may, and upon objection must, exclude opinion testimony that is based in whole or in significant part on matter that is not a proper basis for such an opinion. (Evid. Code, § 803.) . . . [¶] Whether an opinion should be held inadmissible in a particular case depends upon the extent to which the improper considerations have influenced the opinion. [Citation.] Such questions are addressed to the sound discretion of the trial court." (*County Sanitation Dist. v. Watson Land Co.* (1993) 17 Cal.App.4th 1268, 1277.)

Here, Willmette's opinion about the fair market value of the property, expressed in his appraisal report, was based on the determination that its highest and best use was as rural residential property, and in seeking out comparable properties he searched specifically for similarly-sized sites suitable for building a residence. This was inconsistent with the terms of the May 23 agreement (which Willmette was not given to guide his appraisal), as the trial court properly interpreted that agreement. Based on the premise that the purpose of the agreement was to give Lawson enough money to purchase land for growing crops to replace the deed restricted property that could not be put to that use, and based on the clear implication from Willmette's appraisal report that comparable property suitable only for agricultural use *could* be found within the same general vicinity, the trial court acted within its discretion in determining that Willmette's appraisal should be excluded from evidence because it was based on the improper consideration of the value of rural residential property, rather than rural agricultural property.

Once evidence of Willmette's appraisal was properly excluded, it was entirely proper for the trial court to grant Dole's motion for nonsuit based on Lawson's concession that it could not prove its case without that evidence.

18

DISPOSITION

The judgment is affirmed.  Dole shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)

      ROBIE    , J.

We concur:

      RAYE    , P. J.

      NICHOLSON    , J.