Filed 6/30/15  Equivest v. D.R. West CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| EQUIVEST LLC,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>D.R. WEST LLC et al.,<br><br>    Defendants and Respondents. | D067426<br><br><br>(Super. Ct. No. INC086415) |

APPEAL from a judgment of the Superior Court of Riverside County, John G. Evans, Judge.  Affirmed.


Fidelity National Law Group and Thomas A. Trapani for Defendants and Respondents.

Roemer & Harnik, Brian S. Harnik, Mary E. Gilstrap and Helen P. Dreyer Kock for Plaintiff and Respondent.

This case involves a series of complicated loan transactions between multiple entities.  Equivest, LLC (Equivest) was a hard money lender for real estate projects. George Nicholas, Jr. was involved in multiple real estate development projects and

utilized single purpose entities for those projects. Nicholas's entities included D.R. West LLC (DR West), Golden State Enterprises, LLC (Golden State), Nicholas Ventures, Inc. (Nicholas Ventures), and The Nicholas Group, LLC (Nicholas Group, collectively the Nicholas Entities).

Equivest brought an action against Nicholas and the Nicholas Entities for breach of contract in connection with financing it provided for real estate development projects in the Coachella Valley. Equivest also sued Investec Ramon Investors, LP (Investec) for foreclosure alleging Equivest's loans were secured by a property interest Investec had purchased from DR West in a property called Gene Autry Plaza. After a bench trial, the court entered judgment in the amount of $1,698,061.64 in favor of Equivest and against Nicholas and the Nicholas Entities on Equivest's breach of contract claim. The court also entered judgment against Investec on Equivest's judicial foreclosure cause of action. DR West and Investec appeal, contending the trial court erred in relying on parol evidence to vary the terms of the agreements between the parties, awarding damages, and finding that Equivest was entitled to judicial foreclosure. We reject DR West's and Investec's arguments and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Airport Plaza Project*

One of Nicholas's projects, known as the Airport Plaza, was a proposed development of over 20 acres of land in Palm Springs. Golden State, an entity owned by Nicholas through one or more of his other entities, was the owner and developer of that project. Equivest loaned Golden State $1.2 million for the Airport Plaza. This loan was

2

in addition to another loan of $7,750,000 Golden State had obtained from a third party lender, Integrated Financial Associates, for the same project (the IFA Loan).

The IFA Loan required that it be given a first secured position against the Airport Plaza property. Thus, Equivest agreed to subordinate its loan to a second position. As a result of taking a riskier second position, Equivest obtained additional collateral for its loan, including an assignment of a 75 percent interest Nicholas Group held in a promissory note by Golden State, and a second deed of trust given by GSV-2 Resort Developers LLC (GSV-2), another of Nicholas's entities, against a project called The Retreat in Rancho Mirage, California. The additional collateral was memorialized in an Optional Advance Promissory Note Modification Agreement signed by Golden State and Nicholas Group.

*Gene Autry Plaza Project*

In 2006, Nicholas also had discussions with Equivest concerning financing for a project known as the Gene Autry Plaza project. That property was approximately six and a half acres of land in Palm Springs, which was controlled by the Bureau of Indian Affairs. DR West had a long term lease on the property. The BIA had to approve any instrument that affected or created an interest in the Gene Autry Plaza property. Nicholas wanted to develop the property to include a project that had two major retail tenants and informed Equivest that he was in negotiations with Best Buy, Staples and Longs Drugs as potential tenants.

In early 2007, while Equivest was considering a loan on the Gene Autry Plaza project, Nicholas informed Equivest that DR West obtained an interim one-year loan in the amount of $3,550,000 from another company (the Mosco Loan). The Mosco Loan was secured by a deed of trust on DR West's leasehold interest in the Gene Autry Plaza property.

Nicholas asked Equivest to take over the Mosco Loan or pay it off because it was a short term loan and was not subject to subordination. Thus, Equivest would loan the same amount as the Mosco Loan. Equivest reached out to its investor participants and obtained commitments for the entire $3.55 million loan amount. One of the investors, Virtual Realty Enterprises (Virtual Realty), agreed to fund approximately half of the loan. Virtual Realty wanted DR West to obtain a signed lease from an anchor tenant before funding the loan.

In July 2007, DR West executed a note secured by a deed of trust for Equivest's $3.55 million loan (the $3.55 Million Loan). In connection with the $3.55 Million Loan, DR West also signed a Leasehold Deed of Trust against the Gene Autry Plaza property. These documents were signed by DR West, through Golden State, its managing member, through Nicholas Ventures, its managing member, through Nicholas. The Leasehold Deed of Trust stated that it secured payment of the indebtedness on the $3.55 Million Loan and "Related Documents," which included "all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the indebtedness."

4

The $3.55 Million Loan provided for an annual interest rate of 16 percent. It also provided that "[a] minimum of six (6) months interest on the original principal sum advanced, or the total sum of [$284,000], shall be earned and retained by [Equivest] regardless of the actual date of repayment, even if th[e] Note [was] repaid in full or in part within the first six months." The same interest rate of 16 percent applied to any advances made by Equivest under the terms of the Leasehold Deed of Trust. The Bureau of Indian Affairs approved the $3.55 Million Loan and Leasehold Deed of Trust.

Equivest's $3.55 Million Loan included a "land draw" component. Equivest described the land draw as an "amount in the loan (to be disbursed as cash to [DR West]) which was not allocated to retiring the existing preconstruction loan or other costs and disbursements. Simply put, this was money that would be available to the borrower to use however the borrower desired. . . . In summary, after all closing costs and fees had been paid, Equivest had received its loan origination fee, the pay-off had occurred on the existing preconstruction loan and the conditions for release had been met, [DR West] would be left with approximately $600,000 to do with as it saw fit." Around September 2007, Nicholas notified Equivest that the first anchor tenant lease had been approved and that he expected to receive a signed lease imminently. Thus, Nicholas asked Equivest to gather the funding for the $3.55 Million Loan and prepare for closing. Equivest gathered $1,710,000 from its investor participants and held that money in its client trust account. The investors for the remaining loan funds planned to wire their money when the loan was set for disbursement.

5

When days passed and Equivest had not been notified of the status of the leases, it contacted Nicholas. Equivest advised Nicholas that at least one of its investors was concerned that his money was sitting dormant in Equivest's trust account. At that point, Nicholas confirmed in an e-mail that a tenant lease was imminent and he agreed to pay "16% on the outstanding payments . . . until Virtual [Realty] funds Gene Autry Plaza" (Interest Agreement). The "outstanding payments" were the funds Equivest was holding in its trust account and 16 percent was the interest rate set forth in the $3.55 Million Loan. Nicholas also agreed to pay seven points on the entire $3.55 million as that amount was earned by the investors who deposited or stood ready to deposit their funds with Equivest.

*$540,000 Note*

The IFA Loan and Equivest's $1.2 million Airport Plaza loan were due to mature around July or August 2007. In October 2007, Golden State was in default on those loans. In order to obtain extensions on the loans, Nicholas needed money to pay extension fees, interest due, loan costs, and other fees associated with the Airport Plaza project. He also needed money to make the monthly interest payments that were due on the Mosco Loan for the Gene Autry Plaza.

Nicholas approached Equivest and asked to borrow approximately $650,000 utilizing the land draw component of the $3.55 Million Loan. In an October 4, 2007 e-mail to the chief development officer of one of his companies, Nicholas indicated that Equivest wanted to know how they were paying on the Mosco Loan but not on Equivest's $1.2 million Airport Plaza loan. Nicholas stated, "I would say to [Equivest] that we will

6

bring [its Airport Plaza] loan current out of our 650K." Equivest understood that the $650,000 was in reference to the land draw component of the $3.55 Million Loan.

Equivest discussed Nicholas's request for funds with Craig Dibona, one of Equivest's investor participants for the $3.55 Million Loan. Specifically, Equivest asked to release $540,000 of Dibona's contribution in advance of the remainder of the loan. The disbursement of the $540,000 was documented in a promissory note, dated October 15, 2007 (the $540,000 Note), which detailed the intended application of the funds. The funds were intended to pay interest on the Mosco Loan, interest due on Equivest's Airport Plaza loan, extension fees, and other expenses.

Equivest required additional collateral for the $540,000 Note because it presented a greater risk as the Mosco Loan was still in first position. The $540,000 Note stated that it was secured by: (1) the net proceeds DR West would receive when Equivest funded the $3.55 Million Loan, and (2) a pledge of Nicholas Group's payee rights under a note from GSV-2 which were in excess of amounts already given as security to Equivest for its Airport Plaza loan.

Equivest asked Nicholas who he wanted to have as obligors on the $540,000 Note. Nicholas stated that Nicholas Group could sign and confirm the obligations of all parties. Nicholas also indicated that Nicholas Group was the majority owner and controller of all of the various entities and had taken over their development projects. Thus, Nicholas requested that the funds be disbursed as indicated in the $540,000 Note rather than have Equivest disburse the money to DR West who would then transfer it. The $540,000 Note was executed by Nicholas Group, through Nicholas as its manager. According to

7

Equivest, the Bureau of Indian Affairs did not need to approve the $540,000 Note because it was an advance on the existing deed of trust and did not change the term or amount of the deed of trust.

The maturity date of the $540,000 Note was originally in December 2007. Equivest agreed to extend that date until February 2008 in exchange for an extension fee of $54,000.

Around February 2008, Nicholas finally informed Equivest that he had obtained leases for the Gene Autry Plaza project. Nicholas also informed Equivest that he was not going to proceed with obtaining the balance of the $3.55 Million Loan from Equivest. Instead, Nicholas informed Equivest that he intended to proceed with financing from an alternate source. Equivest eventually learned that DR West sold its Gene Autry Plaza leasehold interest to Investec in late 2008. Investec stipulated that it had actual knowledge of the existence of Equivest's deed of trust prior to purchasing DR West's leasehold interest in the Gene Autry Plaza property.

*The Instant Proceedings*

As relevant here, Equivest sued Nicholas and the Nicholas Entities for breach of contract based on their alleged failure to pay amounts due on the $3.55 Million Loan and the $540,000 Note. Equivest also sued Investec for foreclosure on the Gene Autry Plaza property. The parties disputed whether the $540,000 Note was an advance under the land draw provision of the $3.55 Million Loan, which would make it secured by the Leasehold Deed of Trust and create an obligation to pay points, interest and other fees, or whether the $540,000 Note was a new loan secured by different collateral and completely

8

unrelated to the $3.55 Million Loan. The trial court heard extensive testimony regarding the circumstances surrounding the various loans and the parties' interpretation of the documents.

After a bench trial, the court awarded Equivest $1,698,061.64 on its breach of contract claim. This amount included principal, interest and fees on the $3.55 Million Loan and the $540,000 Note. In making its ruling, the court found "the $540,000 loan was an advance under the terms of the [$3.55 Million Loan]. It was Nicholas who approached [Equivest] to obtain the Land Draw money. Nicholas wanted an advance to hold him over on other obligations to give him 10 days to secure the Staples lease so that the full $3.55 million loan could fund. It was Equivest who offered to make the advance for 60 days. . . . [T]here was a meeting of the minds that the loan was an advance under the Land Draw provision of the $3.55 [M]illion [L]oan." The court also found Nicholas and the Nicholas Entities were all liable for the breach of contract because the Leasehold Deed of Trust defined the "borrower" as all parties signing the $3.55 million note in whatever capacity. Lastly, the court found Equivest was entitled to judicial foreclosure on the Gene Autry Plaza property.

## DISCUSSION

### I. *Admission of Extrinsic Evidence*

A. General Legal Principles

" 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' [Citations.] The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used

9

in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912.) Moreover, "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." (Civ. Code, § 1642; *Harm v. Frasher* (1960) 181 Cal.App.2d 405, 412-413.)

When parties to a contract dispute the meaning of contract terms, "[t]he decision whether to admit parol evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 (*Winet*).)

In *Pacific Gas & E. Co. v. G. W. Thomas Drayage & Rigging Co., Inc*. (1968) 69 Cal.2d 33 (*Pacific Gas*), the California Supreme Court explained the test for admissibility of extrinsic evidence to explain the meaning of a writing: "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Id*. at p. 37.) "Although extrinsic evidence is not admissible to

10

add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose. The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms." (*Id*. at p. 39.) "Accordingly, rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties. [Citations.] Such evidence includes testimony as to the 'circumstances surrounding the making of the agreement . . .' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.' [Citations.] If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, is 'fairly susceptible of either one of the two interpretations contended for . . . [citations], extrinsic evidence relevant to prove either of such meanings is admissible.' " (*Id*. at pp. 39-40, fns. omitted.)

Although parol evidence generally is not admissible to contradict express terms of an integrated agreement or explain what the agreement was, it may be admitted to resolve ambiguities and clarify inconsistent provisions in a written agreement. (*Chastain v. Belmont* (1954) 43 Cal.2d 45, 51-53; *Sunniland Fruit, Inc. v. Verni* (1991) 233 Cal.App.3d 892, 898.) Whether a contract is ambiguous is a question of law subject to de novo review on appeal. (*Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 554-555.)

"An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement." (*Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 13.) Whether a contract is integrated is a question of law to be

11

decided by the court. (*Id.* at p. 14.) " 'In ruling on the matter of parol evidence and the preliminary issue of integration, a court must consider such factors as the language and completeness of the written agreement and whether it contains an integration clause, the terms of the alleged oral agreement and whether they contradict those in the writing, whether the oral agreement might naturally be made as a separate agreement, and whether the [trier of fact] might be misled by the introduction of the parol testimony. . . .' " (*Marani v. Jackson* (1986) 183 Cal.App.3d 695, 702.) When interpretation of the contract turns on the credibility of conflicting extrinsic evidence, the trier of fact must resolve the conflict in the evidence and we will uphold any reasonable construction of the contract by the trial court. (*Morey v. Vannucci*, *supra*, 64 Cal.App.4th at pp. 912-913.)

B. The Trial Court's Findings

DR West and Investec contend the judgment must be reversed because the trial court failed to make required threshold findings regarding integration and ambiguity necessary to rely on parol evidence. We reject this argument.

"Where [a] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358.) Reversible error is found only where a statement of decision fails to make findings on a material issue that would fairly disclose the trial court's determination. "Even then, if the judgment is otherwise supported, the omission to make such findings is harmless error unless the evidence is

12

sufficient to sustain a finding in the complaining party's favor which would have the effect of countervailing or destroying other findings. [Citation.] A failure to find on an immaterial issue is not error." (*Hellman v. La Cumbre Golf & Country Club* (1992) 6 Cal.App.4th 1224, 1230.)

In this case, the trial court set forth a detailed statement of decision. Although the statement of decision does not specifically make findings on ambiguity and integration, it is clear the court made those findings as it found the $540,000 Note was an advance on the $3.55 Million Loan. It also found the Leasehold Deed of Trust applied to both the $540,000 Note and Interest Agreement as it concluded Equivest was entitled to judicial foreclosure on the Gene Autry Plaza to the extent of the damages found on the breach of contract cause of action, which included damages relating to the $540,000 Note and Interest Agreement. Nevertheless, the chief and threshold issue to be resolved on appeal is whether the admission of parol evidence was erroneous. This legal issue can be resolved through a plain reading of the documents and record, without the need of further assistance from the statement of decision. Rulings on ambiguity and integration are questions of law subject to independent review. (*Winet*, *supra*, 4 Cal.App.4th at p. 1165; *Esbensen v. Userware Int'l, Inc*. (1992) 11 Cal.App.4th 631, 638, fn. 4; *Malmstrom v. Kaiser Aluminum & Chem. Corp*. (1986) 187 Cal.App.3d 299, 314.)

C. $540,000 Note

DR West and Investec argue the trial court erred in admitting parol evidence to interpret the $540,000 Note because it was an integrated agreement with unambiguous terms. In particular, they assert the $540,000 Note was a new loan that was independent

13

from the $3.55 Million Loan as it was made by a different entity and secured by different collateral. Equivest, on the other hand, contends the $540,000 Note was an advance on the $3.55 Million Loan, making it secured by the Leasehold Deed of Trust on the Gene Autry Plaza property.

DR West and Investec assert that because the trial court sustained "best evidence" and "document speaks for itself" objections to questions about the $540,000 Note, the trial court initially found parol evidence was inadmissible and then inexplicably changed its mind. We disagree as this argument conflates the secondary evidence and parol evidence rules. Under the "secondary evidence rule," formerly known as the "best evidence rule," the court shall exclude secondary evidence of the content of a writing if a dispute exists concerning the terms of the writing and justice requires exclusion or admission would be unfair. (Evid. Code, § 1521.) This rule pertains to the form in which evidence may be introduced. On the other hand, the parol evidence rule is an issue of substantive law regarding whether a writing may be explained by extrinsic evidence. (*Dollar v. International Banking Corp.* (1910) 13 Cal.App. 331, 343.)

It is clear from the record before us that in sustaining DR West's and Investec's objections based on "best evidence" and the "document speaks for itself," the court was not making a ruling regarding the admission of parol evidence. Rather, the court sustained the objections when Equivest's counsel asked a witness about the content of the $540,000 Note. Thus, the court sustained the objections under the secondary evidence rule. The court's evidentiary rulings were not determinative of whether the $540,000 Note was an integrated or unambiguous document.

14

Based on our review, the $540,000 Note was not an integrated agreement. It does not state that it was integrated and although it references two items of security, it does not exclude other forms of security from the agreement. The absence of an integration clause may show that the parties did not intend for the writing to be integrated. (*Wallis v. Farmers Group, Inc.* (1990) 220 Cal.App.3d 718, 730.)

Moreover, the $540,000 Note does not appear clear and complete. The face of the $540,000 Note reveals an ambiguity and that it was not integrated. Nicholas Group, through its manager, Nicholas, is the sole signatory on the $540,000 Note. DR West is not identified as a party to the agreement. However, part of the security for the $540,000 Note was "an assignment of the net proceeds to be received upon closing of the pending refinance of the Gene Autry Plaza $3.55 Million Loan." Those net proceeds were going to be disbursed to DR West. Further, the $540,000 Note included disbursement instructions that provided the funds were intended in part to pay DR West's obligations on the Mosco Loan and Golden State's obligations on Equivest's Airport Plaza loan. These provisions create an ambiguous document with respect to the security and obligors. Thus, the trial court could properly consider extrinsic evidence to resolve ambiguities and determine whether the language of the $540,000 Note was reasonably susceptible to the interpretations urged by the parties.

As we already stated, the parties offered varying explanations as to the meaning of the $540,000 Note. Equivest claimed it was an advance on the $3.55 Million Loan while DR West and Investec asserted it was a completely independent loan agreement. Based on our independent review, we conclude that in view of the $3.55 Million Loan and the

15

trial testimony, the $540,000 Note is reasonably susceptible to the interpretation urged by Equivest, i.e., that the note was an advance on the $3.55 Million Loan.

The extrinsic evidence presented at trial regarding the circumstances surrounding the $540,000 Note's execution reveals that the note is "fairly susceptible of either one of the two interpretations contended for . . . ." (*Pacific Gas*, *supra*, 69 Cal.2d at p. 40.) The record shows that just before execution of the $540,000 Note, Golden State was in default on the IFA Loan and Equivest's $1.2 million Airport Plaza loan. In order to obtain extensions on those loans, Nicholas needed money quickly to satisfy its Airport Plaza obligations. He also needed money to make the monthly interest payments that were due on the Mosco Loan for the Gene Autry Plaza. Thus, Nicholas approached Equivest and asked to borrow approximately $650,000 utilizing the land draw component of the $3.55 Million Loan. He referenced the land draw in an e-mail concerning amounts due on Equivest's Airport Plaza loan by stating that they would bring the loan current "out of our 650K."

Additionally, the evidence established that when Equivest asked Nicholas about signatories on the $540,000 Note, Nicholas stated that Nicholas Group could sign and confirm the obligations of all parties. Nicholas also indicated that Nicholas Group was the majority owner and controller of all of the various entities and had taken over their development projects.

We reject DR West's and Investec's argument that the parol evidence impermissibly contradicts the security provision in the $540,000 Note. Although the $540,000 Note specifically references only two items of security, it also references net

proceeds of the $3.55 Million Loan entered into by DR West for the Gene Autry Plaza, does not state that it was an integrated agreement or exclude other forms of security from the agreement. Again, the $540,000 Note's language in the context of the entire document as well as the extrinsic evidence permits a conclusion that the note was reasonably susceptible to the interpretation urged by Equivest. The parol evidence explained the terms of the $540,000 Note rather than adding to, deleting from or varying its terms. Accordingly, the trial court did not err in admitting parol evidence to interpret the $540,000 Note.

D. Interest Agreement

The Interest Agreement was an e-mail from Nicholas to Equivest stating: "We can return 16% on the outstanding payments starting Monday until Virtual [Realty] funds Gene Autry Plaza; We sent our final comments to Staples yesterday late afternoon and [are] pushing Staples for a quick reply so that we can execute the lease." DR West and Investec contend that the trial court erred in relying on parol evidence to vary the terms of the Interest Agreement because it was an integration not secured by the Leasehold Deed of Trust on the Gene Autry Plaza property. They also assert that DR West was not an obligor under the Interest Agreement. Equivest contends the Interest Agreement was part and parcel of the $3.55 Million Loan.

The e-mail is ambiguous on its face and there is no indication that it was an integrated agreement. In fact, the e-mail necessarily requires reference to other evidence to ascertain its meaning. For example, the "outstanding payments" referred to the funds

Equivest was holding in its trust account. The interest rate set forth in the e-mail is the same rate called for in the $3.55 Million Loan.

The circumstances surrounding the Interest Agreement support Equivest's interpretation. Nicholas sent the Interest Agreement e-mail in response to Equivest's e-mail expressing concern that investor money was sitting dormant in Equivest's trust account. The money in Equivest's trust account was the funding for the $3.55 Million Loan. At that point, Nicholas agreed to pay 16 percent (the interest rate set forth in the $3.55 Million Loan) on the funds Equivest was holding in its trust account. In agreeing to pay 16 percent interest, Nicholas also referenced the Staples lease he was waiting on for the Gene Autry Plaza, which would have triggered funding the balance of the $3.55 Million Loan.

Based on the circumstances surrounding the e-mail, including the complete e-mail chain, we conclude the Interest Agreement is reasonably susceptible to the interpretation urged by Equivest and the trial court properly considered the extrinsic evidence to ascertain the parties' intent.

II. *Sufficiency of the Evidence to Support the Trial Court's Findings*

DR West and Investec contend several of the trial court's findings were not supported by substantial evidence. They first assert there was insufficient evidence to support the trial court's finding that the $540,000 Note was an advance on the $3.55 Million Loan. They also contend the trial court's finding that DR West, Nicholas Ventures, Golden State and Nicholas were liable for breach of contract was not supported by substantial evidence because Nicholas Group was the only borrower identified in the

18

$540,000 Note. They next argue the evidence did not support the trial court's conclusion that the total amount secured by the Leasehold Deed of Trust was $1,698,061.64 and that the trial court erred in finding Equivest was entitled to judicial foreclosure on the Gene Autry Plaza property based on the breach of contract damages. Finally, they contend the trial court's finding that Equivest was entitled to a "loan fee" was not supported by substantial evidence and that the trial court brokered its own loan for the benefit of Equivest.

"In reviewing a challenge to the sufficiency of the evidence, we are bound by the substantial evidence rule. All factual matters must be viewed in favor of the prevailing party and in support of the judgment. All conflicts in the evidence must be resolved in favor of the judgment." (*Heard v. Lockheed Missiles & Space Co*. (1996) 44 Cal.App.4th 1735, 1747.) Applying this standard of review, we reject DR West's and Investec's arguments.

A. *Advance on $3.55 Million Loan*

DR West and Investec argue there was insufficient evidence to support the trial court's finding that the $540,000 Note was an advance on the $3.55 Million Loan. Rather, DR West and Investec claim the evidence showed Nicholas Group was saving the Nicholas Entities' defaulting projects with Nicholas Group's own agreements pledging its assets as security. DR West and Investec cite to evidence that Nicholas advised Equivest that Nicholas Group was the majority owner and controller of many of his entities and had taken over their projects. It then points to evidence that Nicholas Group was the sole

19

borrower identified on the $540,000 Note to suggest that the combined evidence leads to an inference that Nicholas Group was solely responsible for repayment.

This argument misconstrues our role on appeal.  " ' "Where the evidence supports more than one inference, we may not substitute our deductions for the trial court's.  [Citation.]  We may overturn the trial court's factual findings only if the evidence before the trial court is insufficient as a matter of law to sustain those findings.  [Citation.]" ' "  (*Lake v. Reed* (1997) 16 Cal.4th 448, 457.)  Here, the evidence supports an alternative and reasonable inference that the $540,000 Note was an advance on the $3.55 Million Loan.

As we previously explained, the circumstances surrounding the $540,000 Note's execution reveals that the note was reasonably susceptible to Equivest's interpretation that it was an advance on the $3.55 Million Loan.  Nicholas was in desperate need of money because his entities were in default on Airport Plaza and Gene Autry Plaza obligations.  Thus, Nicholas approached Equivest and asked to borrow approximately $650,000 utilizing the land draw component of the $3.55 Million Loan.  Nicholas referenced the land draw in an e-mail explaining how he intended to pay past due obligations on Equivest's Airport Plaza loan and stating that the Leasehold Deed of Trust could not be modified because the Bureau of Indian Affairs had already approved it at $3.55 million.

Equivest approached Dibona, one of its investors in the $3.55 Million Loan, and requested to release Dibona's funds in advance of the remainder of the loan because Nicholas needed money to move the project foward.  Dibona understood that the $540,000 would be rolled into the $3.55 Million Loan when it was funded.  He also

20

understood that the $540,000 Note would be secured by the same collateral as the $3.55 Million Loan. Equivest required additional collateral on the $540,000 Note because it presented a greater risk as the Mosco Loan was still in first position.

When disputes arose regarding defaults on Equivest's Airport Plaza Loan, the $3.55 Million Loan and the $540,000 Note, Equivest wrote to Nicholas to address his payment obligations. In that correspondence, Equivest confirmed its understanding that the $540,000 Note was an advance on the $3.55 Million Loan and secured by the Leasehold Deed of Trust. Nicholas never disputed Equivest's characterization.

Based on the totality of the evidence, including the circumstances surrounding the $540,000 Note, we conclude there was substantial evidence to support the trial court's finding that "there was a meeting of the minds that the [$540,000 Note] was an advance under the Land Draw provision of the $3.55 [M]illion [L]oan."

B. *Obligors*

DR West and Investec contend the trial court's finding that DR West, Nicholas Ventures, Golden State and Nicholas were liable for breach of contract was not supported by substantial evidence because Nicholas Group was the only borrower identified in the $540,000 Note. In making this argument, DR West and Investec ignore the properly admitted extrinsic evidence concerning the circumstances surrounding the $540,000 Note.

21

The trial court concluded that the $540,000 Note was an advance under the terms of the $3.55 Million Loan. As such, the court found Nicholas and the Nicholas Entities were all liable for breach of contract. These findings are supported by substantial evidence.

Several contracts relating to the same matters and that are parts of substantially one transaction are to be taken together. (Civ. Code, § 1642; *Harm v. Frasher*, *supra*, 181 Cal.App.2d at pp. 412-413.) Accordingly, the $540,000 Note, the $3.55 Million Loan and related Leasehold Deed of Trust must be construed together. Viewing these documents as a whole under the substantial evidence standard of review, it is clear that DR West, Nicholas Ventures, Golden State and Nicholas were all liable for breach of contract.

First, the Leasehold Deed of Trust described the borrower as DR West and "all other persons and entities signing the Note in whatever capacity," which included Nicholas, Nicholas Ventures and Golden State. Thus, Nicholas, Nicholas Ventures, Golden State and DR West were all obligated as borrowers. Moreover, the Leasehold Deed of Trust secured "all principal, interest, and other amounts, costs and expenses payable under the [$3.55 Million Loan] or *Related Documents.*" The "Related Documents" included "all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the indebtedness." One of the documents executed in connection with the $3.55 Million Loan and Leasehold Deed of Trust was the $540,000 Note as the evidence showed it was an advance utilizing the land draw provision of the $3.55 Million Loan. Based on these provisions and the circumstances

22

surrounding the execution of the documents, the trial court's conclusion that DR West, Nicholas Ventures, Golden State and Nicholas were liable for breach of contract was supported by substantial evidence.

Even if we did not read the various documents together, Nicholas testified that he admitted in a declaration to the Bureau of Indian Affairs that DR West was a borrower under the $540,000 Note. Specifically, Nicholas stated the "Owner" "obtained a new and separate loan in the principal amount of $540,000" from Equivest. Nicholas acknowledged that "Owner" was defined as DR West. This evidence alone contradicts DR West's and Investec's position that Nicholas Group was the only obligor under the $540,000 Note. Viewing the evidence as a whole, we conclude the trial court's finding was supported by substantial evidence.

C. *Amount Secured by Leasehold Deed of Trust on Gene Autry Plaza Property*

DR West and Investec argue the evidence did not support the trial court's conclusion that the total amount secured by the Leasehold Deed of Trust was $1,698,061.64. Specifically, they contend the Leasehold Deed of Trust did not secure the $540,000 Note and the Interest Agreement because those agreements say nothing about the deed of trust. Thus, DR West and Investec argue the trial court erred in finding Equivest was entitled to judicial foreclosure on the Gene Autry Plaza property based on the breach of contract damages.

To support their argument, DR West and Investec cite to a provision in the Leasehold Deed of Trust that says it was given to secure payment of the "Note," which was defined as the $3.55 million promissory note. In making this argument, DR West

23

and Investec ignore that the Leasehold Deed of Trust also stated that it secured "performance of any and all obligations under . . . Related Documents," which included "all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the indebtedness."  As we previously explained, the evidence supported the trial court's conclusion that $540,000 Note was an advance on the $3.55 Million Loan.  As such, it was a "Related Document" secured by the Leasehold Deed of Trust.

The same is true for the Interest Agreement.  The Interest Agreement was Nicholas's agreement set forth in an e-mail to pay 16 percent interest on the funds Equivest held in its trust account for the purpose of funding the $3.55 Million Loan.  The interest rate in the Interest Agreement is the same rate called for in the $3.55 Million Loan.  Based on this evidence, the Interest Agreement was part and parcel of the $3.55 Million Loan which was secured by the Leasehold Deed of Trust.

Based on the foregoing, the trial court's finding that "the total amount secured by the [Leasehold Deed of Trust] is $1,698,061.64" is supported by substantial evidence as the court reached that amount by calculating amounts due under the $3.55 Million Loan, including the Interest Agreement and the $540,000 Note.  Because the Interest Agreement and $540,000 Note were related to the $3.55 Million Loan, they were subject to the Leasehold Deed of Trust and the trial court properly found Equivest was entitled to judicial foreclosure.

D. *Loan Fee*

In a cursory argument, DR West and Investec contend the trial court's finding that Equivest was entitled to a "loan fee" was not supported by substantial evidence. They merely state that because Equivest only requested interim interest on the funds being held in Equivest's trust account and not a loan fee, there was insufficient evidence to support the trial court's finding.

We reject this argument as substantial evidence supported the trial court's finding on the loan fee. The evidence established that Equivest advised Nicholas that at least one of its investors expressed concern that his money was sitting dormant in Equivest's trust account. At that point, Nicholas agreed to pay 16 percent interest on the funds Equivest held in its trust account. Nicholas also agreed to pay seven points on the entire $3.55 million as that amount was earned by the investors who deposited or stood ready to deposit their funds with Equivest. The trial court, however, did not award Equivest a loan fee on the entire $3.55 million. Instead, the court found Equivest was entitled to recover a loan fee only on the "sums actually on hold by Equivest in its trust account for purposes of making the loan." Accordingly, the trial court did not err when if found Equivest was entitled to a loan fee on the sums held in its trust account for purposes of making the loan.

E. *Loan Terms*

By essentially repeating their prior arguments, DR West and Investec argue the trial court brokered its own loan for the benefit of Equivest. Specifically, they contend the trial court changed the obligors, security, interest and other terms of the $540,000

Note and the Interest Agreement by combining those documents with the $3.55 Million Loan. As we have explained, the evidence supports the trial court's conclusion that the Interest Agreement and the $540,000 Note were part of the larger $3.55 Million Loan transaction. Based on our review of the record, we do not agree with DR West and Investec that the trial court brokered a new loan for Equivest. Rather, the trial court enforced the agreements based on the intent of the parties.

## DISPOSITION

The judgment is affirmed. Respondent is entitled to costs on appeal.

McINTYRE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.