Filed 8/18/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| OAKLAND-ALAMEDA COUNTY COLISEUM AUTHORITY, <br><br> Plaintiff and Respondent, <br> v. <br><br> GOLDEN STATE WARRIORS, LLC, <br><br> Defendant and Appellant. | A157688 <br><br> (San Francisco County Super. Ct. No. CPF-19-516542) |

Appellant Golden State Warriors, LLC (GSW) challenges the trial court's judgment confirming an arbitration award. The arbitration concerned the meaning of the word "terminates" in section 6.4 of the agreement governing the basketball team's use of the Oracle Arena in Oakland, California (the License Agreement). On appeal, GSW argues that "allowing [the] contract to expire by its own terms is [not] the same as terminating the agreement." Oakland-Alameda County Coliseum Authority (the Authority) responds that the parties intended section 6.4 of the agreement to include a "termination by nonrenewal."

GSW allowed the contract to expire. If section 6.4 applies in this circumstance, then GSW must continue servicing the debt incurred to renovate the arena until 2027. In her award, the arbitrator found that GSW terminated the License Agreement by failing to exercise its option to renew it and, therefore, GSW must continue servicing the debt. The trial court

1

confirmed the arbitration award and entered judgment in favor of the Authority. GSW appeals. We affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

In accordance with long-settled authority, the arbitrator provisionally received extrinsic evidence to determine if the word "terminates" in section 6.4 of the License Agreement was ambiguous or reasonably susceptible to the parties' competing interpretations. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37–40 (*PG&E*).) We begin by setting forth the undisputed extrinsic evidence.

Since 1986, the Warriors NBA basketball team played their home games at an arena in Oakland pursuant to an agreement that ended in 1996. In 1995, the team's owner began negotiations to renew the agreement in exchange for a renovated arena.

I. *The Memorandum of Understanding*

On February 21, 1996, a number of entities, including the basketball team's owner, entered into a Memorandum of Understanding (MOU) regarding a new license agreement that was to take effect when the existing agreement ended.[1] The purpose of the MOU was "to outline the material terms to be incorporated in certain definitive agreements providing for the construction of the New Arena and . . . the occupancy of the New Arena . . . by the Warriors (the 'Definitive Agreements'). . . . The parties acknowledge that

---

[1] In 1996, CC Partners owned and operated the Warriors basketball franchise, and CCE, Inc. was its managing general partner. Chris Cohan was president of CCE, Inc. The arbitration award states that, in 2010, the team was sold to GSW Sports, LLC. The parties do not explain the relationship between this entity and the appellant, GSW. We presume the difference, if any, between GSW and GSW Sports, LLC, is immaterial to the issues addressed in this appeal.

2

there have been extensive negotiations concerning the substantive terms of this MOU and that it is their intention . . . to be bound by the substantive terms set forth herein."

The MOU provides the City of Oakland (the City) and the County of Alameda (the County) would finance the renovation by, among other things, issuing bonds. It provides the Warriors would be required to pay rent, and they would also be required to use revenues to help pay down the debt incurred to renovate the arena.

Section 5.1(a) of the MOU proposed a 20-year term for the agreement (1997-2017) with four 5-year options to renew. The Warriors could not terminate the lease in the first ten years (1997-2007), and, if the Warriors terminated it after June 2007, they would be required to pay all of the outstanding renovation debt, subject to various offsets and reimbursements each year until 2027.

Section 5.1(b) of the MOU provides:

> If the Warriors do not exercise either of the first two (2) renewal options and there is a principal balance remaining on the Project Debt and, in any year after the expiration of the New License Agreement and prior to June 30, 2027 in which the New Arena is still operating, the difference between Net New Arena Revenues . . . and the New Arena Operating Expenses is not sufficient to pay Scheduled Debt Service, then the Warriors shall pay . . . an amount equal to the excess of Scheduled Debt Service over such difference.

In other words, if the Warriors did not exercise one of the first two 5-year options to renew the agreement after its initial 20-year term, then they were required to continue making annual debt payments until 2027

subject to an offset based on profits generated by other uses of the arena.[2] Section 7.2 provides that "[t]he Definitive Agreements, upon their execution, shall supersede and replace this MOU and this MOU shall have no further force or effect."

II.     *The Contract Negotiations*

During the contract negotiations, the Authority created the initial draft of the new license agreement.  In a memorandum dated April 24, 1996, the Authority's counsel, Charles Seaman, explained to the Authority's negotiators and representatives of the City and County that "[t]he draft License Agreement with the Golden State Warriors for the New Arena, distributed to all parties on April 12, 1996, took relevant provisions of the MOU and grafted them into the text of the Warriors' existing license agreement.  Where provisions of the MOU were in conflict with the existing license agreement (either explicitly or by necessary implication), the text of the MOU supplanted that of the existing license agreement."

However, Seaman noted a change in the language of section 6.4 of the draft license agreement compared to section 5.1(b) of the MOU.  The MOU provided that the Warriors would have to pay renovation debt, subject to an offset, "[i]f the Warriors do not exercise either of the first two (2) renewal options."  But section 6.4 of the draft license agreement provided that the team's owner would have to do so if it "terminates this License Agreement for any reason prior to June 30, 2027."

_____

[2] A memorandum between attorneys for the Warriors, dated February 9, 1996, entitled "Summary of Deal Points for New Oakland Coliseum Arena" states:  "The Warriors will play at the new arena for at least 20 years with two 5-year renewal terms at the Warriors' option; provided the Warriors must make up any annual deficit in arena debt service for such years if the Warriors do not exercise renewal options.  [Offset?]"

In the April 24 memorandum, Seaman wrote: "In the first sentence of this paragraph, we should revert to the language of the MOU which makes this paragraph applicable if the Warriors do not exercise the first and second extension options." But, by May 21, 1996, Seaman had changed his mind: "In my April 24 memo, I suggested revising the first sentence of this paragraph to reflect language from the MOU. However, since the Warriors have not objected to this text, it should be retained as it can be read to mean that the Warriors are liable for paying the Project Debt where the Warriors exercise any right to terminate the License Agreement . . . including the right to terminate in case of casualty or even default by Licensor?" The language in the draft agreement was not changed back to the language of section 5.1(b) of the MOU.

III.    *The License Agreement*

In July 1996, Oakland-Alameda County Coliseum, Inc. (Licensor), the Authority, and CC Partners (Licensee) executed the License Agreement. The first sentence of section 6.4 provides in part:

> If Licensee terminates this License Agreement for any reason prior to June 30, 2027 and there is a principal balance remaining on the Project Debt and, in any year after the expiration of this License Agreement and prior to June 30, 2027 in which Licensor is operating the New Arena . . . , the difference between Net New Arena Revenues . . . and the New Arena Operating Expenses is not sufficient to pay Scheduled Debt Service, then Licensee shall pay to Licensor an amount equal to the excess of Scheduled Debt Service over such difference.

"Project Debt" is defined as the "debt outstanding from that originally incurred in connection with the construction of the New Arena." "Scheduled Debt Service" means "the principal, interest and related bank and remarketing fees associated with the Project Debt."

5

Section 32 of the License Agreement is an integration clause providing in part that "[t]his License Agreement constitutes the sole and entire agreement among Licensor, Authority and Licensee with respect to the subject matter hereof. There are no other terms, obligations, covenants, conditions or agreements among Licensor, Authority and Licensee with respect to the subject matter hereof other than as contained in this License Agreement."

IV.  *Post-Agreement Developments*

In August 1996, to finance the renovation of the arena, the Authority issued bonds in the amount of $140 million to be repaid over 30 years. During the process of obtaining bond financing, the Canadian Imperial Bank of Commerce (CIBC) sought " 'assurances' " that the team would not leave the Authority with unpaid debt. The team's owner, Chris Cohan, executed a "Consent and Agreement," which provides "that other than a termination due to a default under the Assigned Agreements, the undersigned has no right to terminate or cancel the Assigned Agreements until the Project Debt (as defined in the License Agreement) has been fully paid."

In 2010, the Warriors franchise was sold. In a disclosure letter to the buyer, the team's former owner stated:

> In 1996, the Oakland-Alameda County Coliseum Authority (the 'Authority') issued bonds to finance the renovation of ORACLE Arena. The Executive Director of the Authority has recently been cited as saying that any owner relocating the Team between the expiration of the current lease term in 2017 and the expiration of the period covered by the options in 2027 would require the Team annually to pay any debt service remaining on the bonds used to fund the renovations the Arena could not cover.

6

V.    *The End of the License Agreement, the Arbitration, and the Award*

In 2012, GSW announced its intention to construct a new arena in San Francisco.  GSW did not exercise the renewal option in the License Agreement, and, on June 30, 2017, its initial term as defined in section 6.1 expired.  As a result of construction delays in San Francisco, the parties extended the term of the License Agreement for an additional two years until June 30, 2019.

In October 2017, GSW initiated arbitration proceedings seeking a declaration that it was no longer obliged to make debt payments if it allowed the License Agreement to expire rather than terminating it.  The Authority responded and counterclaimed seeking a declaration "that section 6.4 of the License Agreement requires GSW to pay debt service on the Arena through June 30, 2027."

The arbitration hearing occurred over a three-day period in July 2018. In September 2018, the parties made closing arguments.  In October 2018, the arbitrator issued an interim award in favor of the Authority and against GSW.  In January 2019, the arbitrator issued her final award, which included an award of attorney fees to the Authority.

First, the arbitrator found, based on extrinsic evidence, that the word "terminates" is susceptible to both GSW's and the Authority's interpretations. Second, based on a more extensive review of the extrinsic evidence, the arbitrator found the parties intended to adhere to the terms of the MOU, which require the team to continue making debt payments after the initial term.  As explained by the arbitrator, "[w]ithout any direct evidence of further negotiations, or even any contemporaneous recollection by anyone involved in the drafting of the License Agreement of the language change, the MOU and the parties' negotiations leading up to its execution, provides the

7

best evidence of the parties' intent with regard to the meaning of 'terminates' in [section] 6.4 and the Warriors' debt payment obligations. . . . The executed MOU is a clear and objective manifestation of the parties' intent during the creation of the License Agreement. The MOU is evidence of the real deal agreed to and intended by the parties. The License Agreement between the parties incorporates that deal."

The arbitrator concluded the Authority "met its burden of proof in establishing that the use of the word 'terminates' in [section] 6.4 of the License Agreement encompasses the decision of the Warriors not to renew its option upon expiration of the Initial Term of the License Agreement. Therefore, the Warriors are obligated to reimburse the Project Debt in accordance with and as set forth in [section] 6.4 of the License Agreement."

VI.     *The Trial Court's Confirmation of the Award*

GSW petitioned to vacate the arbitration award and the Authority petitioned to confirm it. The trial court granted the Authority's petition and denied GSW's.

The trial court found the arbitrator did not err in concluding that GSW terminated the License Agreement by deciding not to exercise the option to renew. The court determined the arbitrator "correctly relied on extrinsic evidence and the Warriors' conduct to conclude that they are required to service the renovation project debt. The extrinsic evidence was used to explain—not to contradict or vary—the terms of the contract. The evidence shows that the parties used the word 'terminates' to include a license termination where the Warriors failed to exercise the option to renew."

The trial court faulted GSW for focusing on the contract language alone, and for drawing "too fine a distinction between the term 'terminate' and 'expire.' " The trial court found that the Warriors' conduct after

8

execution of the License Agreement indicated that it is reasonably susceptible to the Authority's interpretation.

The trial court entered judgment in favor of the Authority. GSW appeals.

DISCUSSION

On appeal, GSW contends that "[t]he question posed by this case—and reviewable on appeal under the terms of the parties' arbitration agreement—is whether allowing a contract to expire by its own terms is the same as terminating the agreement." First, we consider our authority to review the decisions of the arbitrator and the trial court.

I.      *The Scope of Our Review*

An " 'arbitrator's decision is not ordinarily reviewable for error by either the trial or appellate courts.' " (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1354.) To "take themselves out of the general rule that the merits of the award are not subject to judicial review, the parties must clearly agree that legal errors are an excess of arbitral authority that is reviewable by the courts." (*Id.* at p. 1361.)

Here, section 39.3.11 of the License Agreement provides: "The decision of the arbitrator shall be final and binding upon the parties without appeal or review except as permitted by California law, . . . provided, however, that either party may file an application to correct or vacate the arbitration award or an application for de novo review on all questions of law based on the arbitrator's finding[s] of fact (which are deemed for such purpose to be stipulated by the parties), in either case under California Code of Civil Procedure Section 1285 et seq. Any party may apply to any court of competent jurisdiction for confirmation and entry of judgment based on said award."

9

In *Cable Connection, Inc. v. DIRECTV, Inc.*, our high court considered this arbitration provision and held that the parties may "agree that legal errors are an excess of arbitral authority that is reviewable by the courts." (*Cable Connection, supra*, 44 Cal.4th at pp. 1347, 1361.) Accordingly, based on the parties' agreement, we independently review questions of law.

We look to California's rules of contract interpretation to decide whether the questions we address are factual or legal. When interpreting contracts, courts must first determine whether the language is ambiguous, or, in other words, whether it is reasonably susceptible to the interpretation urged by a party. (*WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1710.) The "threshold determination of 'ambiguity' . . . is a question of law," "subject to independent review." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.) Because it presents a legal question, we begin by addressing whether section 6.4 of the License Agreement is reasonably susceptible to the interpretations advanced by the parties.

II.     *Section 6.4 of the License Agreement Is Ambiguous*

Section 6.4 provides that GSW, the licensee, must continue making debt payments "[i]f Licensee terminates this License Agreement for any reason prior to June 30, 2027." GSW claims "the plain meaning of the word 'terminates' requires an affirmative act by a party to bring a contract to an end before its prescribed term has expired." The Authority responds that "terminates" is reasonably susceptible to an interpretation encompassing a "termination by nonrenewal." We agree with the Authority.

Civil Code section 1638 provides that the "language of a contract is to govern its interpretation, if the language is clear and explicit," and section 1639 provides that when "a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." But, as

10

explained by our high court over fifty years ago, the meaning of words can change depending on the circumstances. (*PG&E*, *supra*, 69 Cal.2d at p. 38.) As a result, " '[t]he exclusion of parol evidence regarding such circumstances merely because the words do not appear ambiguous to the reader can easily lead to the attribution to a written instrument of a meaning that was never intended.' " (*Id.* at p. 39.)

"Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose." (*PG&E*, *supra*, 69 Cal.2d at p. 39.) Accordingly, courts must preliminarily consider all credible evidence offered to prove the intention of the parties so that courts can place themselves " 'in the same situation in which the parties found themselves at the time of contracting.' " (*Id.* at pp. 39–40.) If, after considering this evidence, the language of the contract " 'is fairly susceptible of either one of the two interpretations contended for,' " then the extrinsic evidence is admissible to prove that meaning. (*Id.* at p. 40.)

Here, based on our preliminary consideration of the extrinsic evidence, we agree with the arbitrator that it is "fully plausible" to interpret the word "terminates" in section 6.4 of the License Agreement as including a termination by nonrenewal. Sections 5.1(a) and (b) of the MOU memorialized a key compromise whereby the Warriors would sign a 20-year lease with four 5-year options to renew, requiring the Warriors to play in the arena for the first ten years, allowing the Warriors to leave after ten years by paying the renovation debt in full, or after 20 years by making debt service payments less an offset until 2027. There is no evidence the parties attempted to renegotiate this key compromise.

11

With minor changes, section 5.1(a) of the MOU became sections 6.1, 6.2 and 6.3 of the License Agreement. The language in section 5.1(b) of the MOU was changed to the language in section 6.4 of the License Agreement, but a May 21, 1996 internal memo from Seaman—the Authority's counsel—to the Authority's negotiators and City and County representatives suggests he understood the change as creating a broader obligation to repay debt, not a narrower one.

Notably, the team's owner, Chris Cohan, also believed the team could avoid servicing the project debt only under limited circumstances. Shortly after the agreement was executed, when the Authority was seeking bond financing to construct the new arena, Cohan acknowledged to CIBC that "other than a termination due to a default . . . . , the undersigned has no right to terminate or cancel the Assigned Agreements until the Project Debt (as defined in the License Agreement) has been fully paid." In 2010, the team's owner wrote a disclosure letter to the team's new buyer, as set forth *ante*, that also supports a broad interpretation of the term "terminates" in section 6.4 of the License Agreement.

In arguing otherwise, GSW relies on cases that are inapposite either because they do not apply California law (see, e.g., *Sleepy's LLC v. Select Comfort Wholesale Corp.* (2d Cir. 2015) 779 F.3d 191, 197) or because they shed no light on how the parties to this agreement may have understood the term "terminates." (See, e.g., *Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 14 [analyzing whether real estate document could be construed as a mortgage]; *Mackey v. Bristol West Ins. Service of Cal., Inc.* (2003) 105 Cal.App.4th 1247, 1264 [interpreting insurance policy and provisions of the Insurance Code].)

Here, our provisional review of the extrinsic evidence demonstrates the parties may have intended the phrase "terminates this License Agreement for any reason" to encompass a termination of the agreement by the failure to exercise the first two 5-year options to renew it. Section 6.4 of the License Agreement is reasonably susceptible to the parties' competing interpretations, and this parol evidence is admissible to prove what the parties intended. (*PG&E*, *supra*, 69 Cal.2d at pp. 38–40.)

III.     *The Meaning of Section 6.4 of the License Agreement*

Next, we turn to the "second step—the ultimate construction placed upon the ambiguous language—[which] may call for differing standards of review, depending upon the parol evidence used to construe the contract." (*Winet v. Price*, *supra*, 4 Cal.App.4th at pp. 1165–1166.)

A.     *Is Interpretation of Section 6.4 a Question of Law or Fact?*

Interpretation of a contract is a question of law "when it is based on the words of the instrument alone, when there is no conflict in the extrinsic evidence, or when a determination was made based on incompetent evidence." (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395.) In addition, courts interpret a contract as a matter of law "even when conflicting inferences may be drawn from the undisputed extrinsic evidence [citations] or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126–1127, fn. omitted.)

"But when . . . ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact . . . ." (*City of Hope National Medical Center v. Genentech, Inc.*, *supra*,

13

43 Cal.4th at p. 395.)  In other words, if interpreting the contract involves deciding between "conflicting extrinsic evidence concerning the meaning of . . . contractual provisions," or "divergent testimony about what the parties understood certain contractual provisions to mean," then it is a factual question, not a legal one.  (*Id.* at pp. 385, 394.)

B.      *The Arbitrator's Interpretation Was Factual, Not Legal*

Here, GSW argues "the facts are not disputed."  Acknowledging that we can only review questions of law, GSW focuses on the evidence in the record that was undisputed, such as Seaman's April 24 and May 21, 1996 memoranda, and GSW argues the arbitrator and the trial court drew incorrect inferences from this evidence.

The Authority responds that "if the extrinsic evidence here was disputed—which it was—then this Court *must* affirm the judgment, *regardless* of how this Court otherwise might interpret the License Agreement, because the arbitrator's interpretation must be deemed 'stipulated by the parties' . . . and the arbitration award '*is not subject to judicial review*.'"

We agree with the Authority.  In our view, the second step of the arbitrator's analysis—deciding what the parties meant—addressed a question of fact, not a question of law.  At the arbitration hearing, which lasted three days, eight witnesses testified in person, and one witness testified by deposition.  In her discussion of the extrinsic evidence of intent, the arbitrator found the obligations at issue "were intensely bargained for by the Authority and agreed to by the Warriors," and she found that the parties sought to adhere to the terms of the MOU during the drafting of the definitive agreements.  The arbitrator rejected GSW's theory that the Authority changed the language of the MOU "because of some 'leverage' the

14

Warriors possessed," noting that the Authority was in a stronger position at the time of drafting the License Agreement, and the team's owner wanted to stay in Oakland.

The arbitrator also rejected GSW's theory that subsequent negotiations regarding a proposed entity to manage the arena were an effort to close the gap in bond-debt payments created by the new language in section 6.4. The arbitrator was not persuaded by the testimony of two witnesses GSW relied upon to support this theory. In addition, the arbitrator found that financial audits prepared by accounting firms "provide no credible evidence of the Warriors' intent during the drafting of the License Agreement." These factual findings support the Authority's argument that the interpretation of this contract was factual, not legal. (*City of Hope National Medical Center v. Genentech, Inc.*, *supra*, 43 Cal.4th at p. 395 [interpretation of contract is a question of fact when based on conflicting extrinsic evidence and credibility determinations].) Because the arbitrator's interpretation of section 6.4 addressed a question of fact, section 39.3.11 of the License Agreement places that interpretation beyond our judicial review.

C. *Assuming the Interpretation of the License Agreement Is a Question of Law, the Undisputed Extrinsic Evidence Supports the Authority's Interpretation*

Nevertheless, even if we assume that the arbitrator addressed a question of law when she interpreted section 6.4 of the License Agreement, we conclude the parties intended this section to include a termination of the agreement upon GSW's failure to exercise the first two options to renew.

Here, the extrinsic evidence includes the MOU, Seaman's memoranda, and the Consent and Agreement between the team's owner and the CIBC. The parties do not dispute the text of these documents, but they draw conflicting inferences from them. For example, GSW argues we can infer

15

from Seaman's memoranda that "the Authority elected to exchange the MOU deal for the ability to trigger GSW's debt service obligation if GSW exercised any right to terminate the License Agreement (including the right to terminate in case of casualty or even default by the Authority)."

We disagree with this inference. As the trial court explained, "[t]he Authority unilaterally changed the language in [section] 6.4 even though the lead negotiators for the parties did not remember any sort of discussion regarding re-negotiating the payment obligation. . . . It makes little sense that the parties would have intended to relieve the Warriors of this obligation where the parties did not discuss it."

According to GSW, it is "entirely irrelevant" that "no witness specifically recalled negotiating the reason for the changed language." But surely if the negotiators intended to relieve the team of a debt payment obligation that, according to the Authority, amounts to $55 million, then they would have recalled discussing the change? Based on their failure to recall any discussion of relieving the Warriors of this obligation, we infer the parties did not intend to do so.

In addition, we construe Seaman's memoranda as memorializing his understanding that the change from section 5.1(b) of the MOU to section 6.4 of the License Agreement *broadened* the team's obligation to continue making debt payments, including if it failed to exercise the first two 5-year options to renew.[3] (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 866–868

___

[3] GSW claims that Seaman testified "that, as used in the License Agreement, 'terminates' refers to an 'affirmative exercise of a right by a party to bring the agreement to an end within its term.'" Putting to one side whether this argument is factual, and therefore beyond our authority to review, Seaman testified that termination was being used in "a broader sense. . . . Because otherwise, it would not have comported with what the

16

& fn. 2 [courts independently determine the meaning of the contract when there is no conflict in the extrinsic evidence, even if this uncontroverted evidence gives rise to conflicting inferences regarding what the parties meant].)

Importantly, this inference receives further support from the team's agreement with the CIBC, which provides "that other than a termination due to a default . . . , the undersigned has no right to terminate or cancel the Assigned Agreements until the Project Debt (as defined in the License Agreement) has been fully paid." This agreement—which reflects the team's understanding of their obligation shortly after the License Agreement was executed—carves out an exception for a termination due to a default, but it implies that if the License Agreement ends for any other reason, then the team must continue making debt payments. In 2010, the team's owner acknowledged that the Authority viewed relocating the team between 2017 and 2027 as requiring continued debt service payments. We conclude the parties understood "terminates" in section 6.4 of the License Agreement to include a termination by nonrenewal. (*Universal Sales Corp. v. California Press Mfg. Co.* (1942) 20 Cal.2d 751, 761 ["when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight"].)

IV. *GSW's Remaining Arguments Fail*

GSW argues the arbitrator and the trial court failed to give effect to the License Agreement's integration clause, and they should have construed

---

parties agreed to in the MOU." Seaman testified that the distinction between "terminate" and "expire" is "not honored with regularity," and that the words are often "used to be synonymous."

section 6.4 against the Authority because the Authority drafted it.  We disagree.

### A.    *The Integration Clause*

Section 32 of the License Agreement provides that it constitutes the parties' "sole and entire agreement."  It further provides that "[t]here are no other terms, obligations, covenants, conditions or agreements . . . with respect to the subject matter hereof other than as contained in this License Agreement."  GSW argues that by relying on the MOU to construe the License Agreement, "the Arbitrator and the trial court wiped out the integration clause and imported into the parties' contract terms flatly contradicting the terms of the License Agreement."

Not so.  "The courts have long recognized that even when a contract is integrated—that is, intended to constitute the parties' final and complete understanding of the terms of their agreement—the *meaning* of the terms of the contract must still be ascertained.  The California Supreme Court . . . permits the admission of extrinsic evidence to interpret the language of an integrated written instrument where such evidence is relevant to prove a meaning to which the contractual language is 'reasonably susceptible.' " (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912–913, fn. 4.)

Here, the MOU was not used to vary, or contradict, the terms of the License Agreement.  Instead, it was used to ascertain what the parties meant by the phrase "terminates this License Agreement for any reason."  Thus, consideration of the MOU was consistent with the License Agreement's integration clause.  (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 521 ["Although extrinsic evidence is not permitted in order to add to, detract from, or vary the terms of an integrated written agreement, extrinsic evidence is admissible in order to explain what those terms are."].)

18

GSW relies on *Hot Rods, LLC v. Northrop Grumman Systems Corp.* (2015) 242 Cal.App.4th 1166, but the case is inapposite. In *Hot Rods*, the integration clause provided that " 'no extrinsic evidence whatsoever may be introduced in any judicial proceedings involving this Agreement.' " (*Id.* at p. 1173.) But here, section 32 of the License Agreement does not bar consideration of extrinsic evidence to explain its meaning.

### B.  *Resolving Ambiguities Against the Drafter*

Civil Code section 1654 provides:  "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."  GSW claims section 6.4 should be construed against the Authority because the Authority "introduced the potential ambiguity into the contract."

We decline to apply this rule.  "Only in those instances where the extrinsic evidence is either lacking or is insufficient to resolve what the parties intended the terms of the contract to mean will the rule that ambiguities are resolved against the drafter of the contract be applied." (*Rainier Credit Co. v. Western Alliance Corp.* (1985) 171 Cal.App.3d 255, 264.)

Here, assuming the interpretation of the contract presents a question of law, then based on the undisputed extrinsic evidence, which includes the MOU, Seaman's memoranda, and the Consent and Agreement with the CIBC, we infer the parties intended "terminates" in section 6.4 of the License Agreement to include a termination by failing to exercise the first two options to renew it.  Therefore, section 6.4 applies, and GSW must continue making debt payments as provided in that section of the License Agreement.

### DISPOSITION

We affirm the judgment.  The Authority is entitled to costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

19

_____

Jones, P. J.

WE CONCUR:


_____

Simons, J.


_____

Needham, J.

A157688

20

Superior Court of San Francisco County, Hon. Ethan P. Schulman

Morrison & Foerster, James P. Bennett, Joshua Hill, Amani Solange Floyd, Miriam A. Vogel, William Herbert; Greines, Martin, Stein & Richland and Kent L. Richland for Defendant and Appellant.

Keker, Van Nest & Peters, John W. Keker and Daniel E. Jackson for Plaintiff and Respondent.